NelsON, J.,
delivered the opinion of the Court.
This case is here stated by its original title, although K. 13. Lanier is not before this Court. It arose upon the following facts: On the 15th of December, 1857, an agreement in writing was entered into between the complainant and K. B. Lanier, by which the latter stipulated to put up and run a steam saw-mill at his own expense on the land of the former near Hatchie River. The complainant agreed to furnish logs at the mill, to suppply the wood for running the same, the slabs from saw-mill logs to be used for wood as far as they would go, and it was agreed that, after the logs were sawed into plank and removed out of the mill by said Lanier, the said parties were to be equal owners, and to bear, jointly and equally, the expense of piling the same and removing it to market, and, when sold, each was to have one-lialf of the net proceeds. The contract was* to continue five years,' and contains other stipulations not material *664 to be here stated. Tbe mill was put up and operated under tbis contract, and a parol agreement as to its modification made in December, 1859, until tbe 12tb January, 1861, when an agreement in writing was entered into between J. L. Green, K. B. Lanier, and W. B. Lanier, by which said Green sold to said Lanier six yoke of oxen and certain other property connected with or necessary to the prosecution of the business, and the right to cut any timber on said Green’s land, with the exception of oak timber; in consideration whereof, the parties of the second part agreed to pay and deliver to said Green 280,000 feet of sound, merchantable poplar lumber, in the city of Memphis, at different times — the 94,000 feet last mentioned in the contract to be delivered within twenty-four months. Said agreement also contains certain provisions as to running Green’s grist-mill and as to not assigning the contract. The recent civil war having commenced, the complainant executed an instrument of writing, as follows:
“ As the Messrs. Lanier think it best, under existing circumstances, to suspend operating the sawmill,v I hereby consent and agree to extend the time specified in the foregoing contract for the same length of time their mill operations may remain so suspended; and I am not bound to furnish the balance of the four hundred barrels of corn until they commence operating the mill. The time above referred to included their two notes for the two last payments of lumber. April 29, 1861. Jas. L. GkeeN.”
On the 19th August, 1861, the complainant executed *665 another instrument of writing, referring to his said contract with Iv. B. and W. B. Lanier, and agreed therein that they might take and saw np, for the use of the army at Fort Pillow, all the oak timber which had been blown down by storms, they paying him ten per cent, of the amount for which they might sell the lumber made out of the same. It is stated in said last named agreement that it was not to affect in any way the agreement theretofore entered into in regard to the temporary suspension of operating the saw-mill.
Numerous dealings and transactions arose out of these agreements; and the parties failing to make a settlement, this bill was filed 25th March, 1862, in the Chancery Court of Lauderdale county, against K. B. Lanier, L. B. Lanier, and W. B. Lanier, charging that defendants were partners in said contracts, and that a large balance was due to complainant, and praying for an account. An attachment was sued out and levied, as alleged, partly by I. G. Barfield, Sheriff, and in part by J. T. Green, a special Deputy Sheriff, on seven slaves, valued at six thousand dollars, and other personal property of 'K. B. Lanier; and on the 1st April, 1862, K. B. Lanier and J. C. Farrar executed what is styled in the record “a replevy bond,” in the penal sum of twelve thousand dollars, for the delivery of said property to the Clerk and Master, or any other person the Court might order. The attachment and bond do not appear to have been regularly returned; but, on the 22d November, 1866, a statement in writing was made upon each by F. Barfield, administrator of Ira G. Barfield, deceased, to the effect *666 that said papers were found by him on the preceding day among the papers of the deceased Sheriff, and returned by the administrator to T. B. Carson, Clerk and Master.
In the progress of the cause, the Clerk and Master was appointed a receiver to collect the debts due complainant and defendant; and at the November Term, 1867, -a decree was pronounced, by consent, directing him to “sell the mill, engine, boiler, machinery, etc., and also to take and state an account between complainant and defendant, K. B. Lanier, and also between the other defendants and complainant, if there is any evidence of an account between them.” No principles or facts were adjudicated in the decree, and no instructions given to the Master as to the mode of taking the account; but it was agreed that he should report “as to what contracts had been broken by either of the parties, or any of them, and what- damage, if any, the opposite party has suffered from said breaches; that the defendants were not to be precluded, by the order, from making any. defense at the hearing which they could have made at the date of the order, and that all questions were reserved until after the coming’ in of the report.”
The Master made a sale of the personal property, which was duly confirmed, and on the 1st June, 1868, filed his report of the account, to which numerous exceptions were filed, under leave from the Court, in behalf of defendants.
In the progress of the cause and upon proper applications, the defendants, Kenneth B. and Lovick B. *667 Lanier, were permitted to file amended answers, in which they pleaded, and afterward established by proof, that they had each received a final discharge in bankruptcy, from the District Court of the United States for the District of West Tennessee — the certificate of the former, showing that he was discharged from all debts and claims provable under the Bankrupt Act, that existed on the 30th May, 1868'; and that of the latter, showing that he was, in like manner, discharged from all debts and claims against him that existed on the 27th November, 1867. The complainant filed an amended and supplemental bill, and W. Y. Cerode, the assignee in bankruptcy, was regularly brought before the Court as an additional defendant.
At the November Term, 1870, the cause was finally heard. Some of the exceptions wfere sustained; others were disallowed; the account recommitted; an instanter report made, and a decree pronounced in favor of the complainant, declaring that K. B. Lanier is indebted to him in the sum of $2,670.48; that K. B. and W. B. Lanier are indebted to him in the sum of $4,177.44; that no decree can be pronounced against K. B. Lanier because of his discharge in bankruptcy, but that the Master should pay over to complainant the funds in Court, amounting to $605; that complainant recover of J. C. Farrar, the security of K. B. Lanier in the replevy bond, the residue of $2,065.48, and of W. B. Lanier and said Farrar, the security of K. B. Lanier in the replevy bond, the sum of $3,934.52, part of said sum of $4,177.44, and of K. B. and W *668 B. Lanier the sum of $203.22, the balance of said debt.
From said decree the defendants, W. B. Lanier, K. B. Lanier and J. C. Farrar, prayed an appeal to this Court, but as no decree was pronounced against K. B. Lanier, his appeal will be dismissed. It does not appear that W. B. Lanier or Farrar executed .an appeal ' bond, and the case is before this Court alone upon the writ of error prosecuted by Farrar, and the agreement of the parties, by their counsel, that it shall also be considered as being here upon a writ of error prosecuted by Cerode, the assignee in bankruptcy.
It is not a little remarkable that neither the Master’s report nor the Chancellor’s decree contains any statement whatever of the grounds of their action. The Master assumes that K. B. Lanier, of the firm of Green & Lanier, is indebted to complainant in a certain sum; that K. B. and W. B. Lanier, are also indebted to him in a large sum; that there was • “ no breach of contract” on the part of complainant, but that there was a breach of contract by K. B. and W. B. Lanier, in failing to deliver lumber at Memphis; and he' proceeds to state accounts against K. B. Lanier, in favor of complainant; Lanier & Green with complainant; the complainant with Lanier & Green; the complainant with K. B. Lanier; Lanier & Green with K. B. Lanier; K. B. Lanier with Lanier & Green; K. B. and W. B. Lanier with the • same; James L. Green with K. B. Lanier, and Lanier & Green with the same.-« These various accounts are not prayed for, in the bill, nor is there anything in the *669 report to show how they came to be stated in these different forms. There are no references to vouchers by numbers, or in any other mode, to show upon what evidence the Master acted in allowing, or disallowing the various items; and where references are made to depositions, they are not made to the pages, or specific parts of the depositions relied upon, but are made in a vague and general way. The Chancellor’s decree declares nothing as to the existence or duration of any alleged partnership, or as to the contract between the parties, or as to the grounds of his action upon the exceptions. There are about 135 exceptions in all; none of which, but the last twelve, are numbered. Three of these exceptions are as follows:
To item 1, to cash of M. E. Cochran & Co., $442.27, because the proof shows that he received $499.53|. To item 2, cash of M. E. C. & Bro., $101.43, because it should be $144.90. To item 7, cash of M. H. & Co., $401.47, because it should be $800.
Three others, selected at random, are as follows:
Item 10, cash of M. H. & Co., $50, because not sustained by proof. Item 11, cash of same $401.46, for want of proof. No. 12, cash of same $100, because proof shows only $50.
Most of the exceptions are of the same character as these, without any intelligible statement of the ground of exception, the nature of the charges excepted to, or the character of the evidence by which the exceptions are sustained; and, in many particulars, *670 tbe Court might ' as well be referred to a table of logarithms, as to tbe matters contained in tbe Master’s report, or the exceptions thereto, and could as readily determine the cause by such a reference, as by those which are given. In 2 Perkins’ Dan. Ch. Pr., 1st Am. ed., 1497, it is said.: “The method of filing and setting down exceptions to a Master’s report * * has been already described in treating of exceptions to a Master’s report upon the insufficiency of an answer.” In the same book, p. 904, it is said that “when the Master has reported an answer not scandalous or impertinent, the plaintiff, in his exceptions to the report, must show in what line or page, and how far the answer is scandalous or impertinent.” And in the notes to the same book, pp. 904, 1497, it is said that exceptions are in the nature of special demurrers, and the party objecting must point out the enor; otherwise the part not excepted to must be taken as admitted: referring to Wilkes v. Rogers, 6 Johns., 566; Story v. Livingston, 13 Pet., 359. This rule was stated, also, in Ridley v. Ridley, 1 Col., 332. It is also declared in Pule XXIX of Chancery Practice, that the exceptions shall set forth the particular points in the report complained of as erroneous: Code, 984.
As laid down by this Court in a case at the last term in Nashville, the exceptions ' to a report should be numbered; refer, to the pages and particular items in .the report excepted to; state briefly the grounds of exception, and refer to the particular pages of the depositions, or documentary evidence relied upon, and not generally to a deposition, which is often of great *671 length, and relates to different subjects, and does not, perhaps, contain more than a single sentence pertinent to the matter excepted to. This can be readily done with little trouble or inconvenience to the person who prepares the exceptions, and will save the Court the intolerable labor of searching, as it is often otherwise required to do, through a large record to ascertain the meaning of exceptions which should explain them ■selves. Each exception is in the nature of a separate suit, and should state the cause for which it is taken.
While the report of the Master should not, upon,the one hand, contain, as has sometimes occurred, copies of the depositions at length, it should not, upon the other, be a mere skeleton, presenting nothing more than a grim array of figures. Each of the items in it should be numbered; and where these items rest upon accounts, receipts, or other vouchers, they should be numbered correspondingly; and where they are supported by depositions, the pages of the depositions should be referred to; and where any question arises as to which the Master deems it his duty to report, or as to which he is unable to report, he should state the facts briefly, and refer to the pages of the depositions, or documentary evidence, upon which he relies. A Master should not be deterred, as is probable in this case, by the apprehension of being charged with a desire to increase his fees, from stating the grounds of his action in a concise and intelligible manner; and while the report in this case will be set aside because the Master appears to have gone to the *672 opposite extreme, lie will, upon the final hearing, be allowed his costs.
The twelve exceptions filed 22d November, 1870, to the Master’s report, approach much nearer the rule than the vague, indefinite and unsatisfactory exceptions previously filed, and have been carefully considered together with them; but as it does not appear that the account was taken under any special instructions, and we are satisfied" that the reports of the Master should be set aside and the Chancellor’s decree reversed, it is not necessary to notice the additional exceptions in detail, and will be sufficient to announce certain general conclusions at which this Court has arrived, and to give certain instructions as to the mode of taking the account.
1. It is manifest that, under the agreement of 15th December, 1857, the complainant and K. B. Lanier were, each, ‘ to have one-half of the net proceeds of the saw-mill, and that this contract, instead of continuing five years, was rescinded by the mutual agreement of the parties, as admitted in the pleadings, on the 12th January 1861, when the new agreement was entered into, signed by James L. Green, K. B. Lanier and W. B. Lanier. An account should, therefore, be taken of the business between the time when the sawmill was put in operation and the 12th January, 1861. In taking said account, so much of the complainant’s account, marked exhibit A to the bill, as is admitted in the answer, or established by proof, should be allowed. But as complainant, in his bill, requires K. B. Lanier to “exhibit, with his answer, on oath, a *673 true and accurate statement of all his accounts against complainant and all accounts between them,” and to state “how much money he has collected under said contract of 13th December, 1857, and how much of the proceeds of the lumber under the said contract he has otherwise used,” etc., etc., and as the defendant, K. B. Lanier, has exhibited, with his answer, a full statement, marked O, of the various dealings and transactions especially called for in these and other interrogatories, the Master will allow each and every one of the items in said exhibit O, unless the same, or either of them, is disproved by two witnesses, or at least one witness with strong corroborating circumstances. The answer shall, in all other respects, where it is responsive to the bill, stand, until it shall appear that the same is so disproved. „
2. Construing the contracts of 12th January, 1861, and 29th April, 1861, in connection with the admission in the pleadings and the facts appearing in evidence, this Court is of opinion that the effect of said contracts was to put an end to complainant’s interest in the profits of the saw-mill; that it is not established by any proof sufficiently satisfactory to overthrow the answers of defendants, that they were partners prior to the 29th April, 1861, or that L. B. Lanier was a partner at any time; that it is sufficient to show that W. B. Lanier and K. B. Lanier were partners on and after the 29th April, 1861, in operating the saw-mill and in its proceeds; but upon a review of the entire cause, this Court holds that they were exonerated from so much of this contract, of 12th January, 1861, as *674 was not performed by reason of the suspension of work in accordance with the agreement of 29th April, 1861, signed by complainant, and by reason of the filing of complainant’s bill, on the 25th March, 1862, before the last payment or delivery of lumber became due. It appears that the first payment of 93,000 feet of lumber was made, but that, in consequence of the military occupation of the country in the vicinity of the mill, it was deemed advisable to suspend operations; that they were suspended until about the 1st August, 1861, when K. B. Lanier was required by the Confederate military authorities to furnish timber for army purposes, and. that complainant, by the agreement of 19th August, 1861, consented that all his fallen oak timber should be sawed up for the use of the army at Fort Pillow, and was to receive ten per cent, of the amount for which the lumber made out of the same should be sold. But it also appears from the admissions in the answer, that 105,000 feet of lumber were sawed under the contract, at ten dollars, in Confederate money, per thousand, which soon ' after became worthless; but, in taking the account, the complainant will be allowed whatever' was the value of the Confederate money at the time it was paid to the extent of his ten per cent, on the amount for which it was sold.
It is in proof that the mill was situate on Hatchie river, about five miles from Fort Pillow; that sawing was done for the Confederates up to within a short time before they evacuated Fort Pillow, about the 4th June, 1862; and that, in consequence of the advance *675 of the Federal army, K. B. Lanier spoke of removing with bis family to Tipton county — soon after which, this attachment bill was filed. It is manifest, from the pleadings and proofs, that the 280,000 feet of sound, merchantable poplar lumber to be delivered in Memphis, under the agreement of 12th January, 1861, were to be sawed at the mill on complainant’s premises; that the agreement made by complainant to extend the time specified for the delivery of the lumber until they should again commence operating their mill, did not, upon any reasonable construction, mean a re-commencement under the fear of military coercion; that tbe agreement signed by complainant on .the 19th of August, 1861, recognized the fact that defendants were sawing for the use of the army at Fort Pillow; and that, although it contained a stipulation that the contract as to the temporary suspension of the saw-mill, was not to be affected, the recognition that defendants were sawing for the army, and the new contract as to the premium to be received on the amount of lumber sawed, operated to suspend the delivery of the lumber at Memphis until the sawing for the army was discontinued, or until a notice'was delivered or request made for the delivery of the lumber. No such notice or request is in evidence; nor does the proof satisfy us that defendants were unwilling to comply with their contract, or that the expression of an intention by K. B. Lanier to remove to Tipton county was a sufficient cause for taking out the attachment. On the contrary, we bold, upon the evidence appearing in the record, that complainant, by causing the mill, etc., to *676 be attached before the last note for the delivery of the lumber was due, prevented the defendant’s from complying with their contract, and that they were thereby exonerated from its performance. It would be inequitable to allow him to share the benefits of an army contract which placed it beyond the power of defendants to deliver the lumber at Memphis, and at the same .time to enforce the contract when he subsequently deprived them of' the means oi fulfilling it. See Conyer. on Cont., 1 Am. Ed., 40; 2 Story on Cont., 4 Ed., s. 976; Ibid., ss. 633, 634, 636 (a), 638, 641, 657, 658 (a); 1 Sneed, 141; 2 Sneed, 275; 4 Hum., 493.
3. It appears that in this voluminous record, a large amount of irrelevant testimony was taken. It is virtually admitted in the bill that the sales of lumber in Mesnphis, belonging to complainant and K. B. La-nier, or in the net profits of which complainant was interested, were settled between the parties to the amount of $19,683.70, and all evidence as to the items in detail, upon which this settlement was founded, was unnecessary. Complainant is entitled only to an account of matters not embraced in that settlement and also not included in the account exhibited with K. B. Lanier’s answer.
4. The various judgments in favor of John Dearing, described in the first, second, third and fourth amended exceptions, are not embraced in the bill or in issue in this cause, and will not be allowed in retaking the account.
5 It does not appear from the record, that the *677 attachment granted in tbis cause was returned into Court by the Sheriff. Among other things, the Sheriff is required “to execute all writs and other process to him issued and directed, within his county, and make due return thereof, either by himself or his lawful deputy:” Code, s. 4093, sub-s. 2. It was his duty to return the attachment, with his levy and the replevy bond, to the first term of the Court after the attachment issued. The evidence of such a return is the official endorsement or statement of the Sheriff, written upon, or attached to, the process at the time of the return. It was long since declared that “due return means the bringing the process into Court, with such indorse-ments on it as the law requires the Sheriff to make: ” Harmon v. Childress, 3 Yer., 329.
It is shown in the record, that an attachment issued 25th March, 1862, and came to the Sheriff on the same day. It has five endorsements upon it; the first, signed by I. G. Barfield, Sheriff, showing that it was levied, the same day, on a steam saw and grist mill and other property; the second, that it was levied the next day, by the Sheriff, on five negro children; the third, that on the 29th March, 1862, the Sheriff deputed J. T. Green to execute the within writ; the fourth, that J. T. Green levied on a negro woman Harriet; and the fifth, hereinbefore alluded to, is in the words and figures following: “ This paper was found, on yesterday, among the papers of Ira G. Bar-field, dec’d, former Sheriff, and by me returned to T. B. Carson, Clerk and Master, this 22d November, 1866. T. Barfield, adm’r.” The paper already mentioned, *678 signed by K. B. Lanier and J. C. Farrar on the 1st April, 1862, was, in like manner, endorsed by the administrator on the 22d November, 1866.
Aside from the express requirements of the statutes, that all processes shall be returned at first term, it would be a very dangerous practice, destructive to the best interests of society and prolific of every species of fraud, to hold that a Sheriff may make a levy upon property, lay the process and return upon it away among his papers, and then by himself or his personal representative return it into Court, at the end of four years and a half, with all the vitality of a regular return, and to the annihilation of intermediate rights.
To make the return part of the record, it is necessary that the writ should be restored to the office whence it originated, as required by law. See Nichol v. Ridley, 5 Yerg., 65. But, as the levy was actually made, and a bond taken, this Court is of opinion that, as between the parties to this suit, the levy was good, and that the bond executed for the delivery of the property, or the payment of the debt, was a valid common law bond, if the attachment was lawfully issued. The rights of the creditors under the bond are not dependent upon the Sheriff’s return. See Lea v. Maxwell, 1 Head, 368; Rogers v. Cawood, 1 Swan, 148; Mitchell v. Lipe, 8 Yerg., 183; Conway v. Jelt, 3 Yerg., 481. But it is only such bonds as are taken according to law that becomes the foundation of a summary proceeding under the Code, s. 3109; and to justify the exercise of this summary jurisdiction, *679 they can only become parts of the record by the Sheriff’s return, duly and properly made.
It may be observed that the paper styled a replevy bond is not, in its terms, such an instrument as is required by the Code, s. 3509. The provisions of that section are, that “the defendant to attachment suit may always replevy the property attached by giving bond with good security, payable to the plaintiff’ in double the amount of plaintiff’s demand, or at the defendant’s option, in double the amount of the property attached, conditioned to pay the debt, interest and costs, or the value of the property attached with interest, as the case may be, in the event he shall be cast in the suit.” • The conditions of the bond in this case are, among other things, that “the said K. B. Lanier and J. C. Farrar shall deliver the property levied on, as above mentioned, to the Clerk and Master of the Chancery Court at Bipley, or to any other persons whom the Court may order to receive said property, in case the Court shall order the property above to be brought forward, immediately after the order of said Court, or said E. B. Lanier and J. C. Farrar shall pay to said James L. Green all debts and demands claimed by him, on or before the final hearing of this cause.”
The conditions are different from those prescribed in the Code, in this, that the Code does not authorize any condition for the delivery of the property, unless it may be implied from sec. 3504; and the bond contains in this case no stipulation as to costs or the payment of the value of the property with interest. *680 As the bond executed is not conformable to sec. 3509 of the statute, the provision in the Code, s. 3515, that “the death or destruction of the property, without any fault of the defendant, after the replevy, is no defense to the liability on such bond,” has no application. If it has such application, when construed in connection with sec. 3509, then we hold that the emancipation of slaves by the act of the Government is not embraced in the words used' in the statute — “death or destruction of the property.” It was held in Craig v. Missouri, 4 Pet., 410, that “a promise made in consideration of an act which is forbidden by the Constitution of the United States, which is the supreme law, is against law and void.” But 'it has been also declared, that “it is a well-settled rule of law that if a party, by his contract, charge himself with an obligation possible to be performed, he must make it good, unless its performance is rendered impossible by the act of God, the law, or the other party:” Dermott v. Jones, 2 Wall, 7. The contract to deliver the slaves was lawful at the time it was made, although the bond may not be a good replevy bond within the meaning of the statute. The time of performance was made to depend upon the final actiqn of the Chancellor; or, in other words, rests upon the termination of this suit. Before the termination of the suit, it became impossible for the parties to deliver the slaves, in consequence of their emancipation by the supreme law; and we hold that, as this was entirely beyond the control of either party, it furnishes a sufficient excuse for the non-performance of the contract. The *681 principle is not in conflict with this view, which was stated in Steamship Co. v. Joliffe, 2 Wall., 450. It is not necessary here to discuss the points upon which three of the Judges delivered a dissenting opinion in that case. In the syllabus of the case, it is said that “ when a right has arisen upon a contract, or a transaction in the nature of a contract, aüthorized by statute, and has been so far perfected that nothing remains to be done by the party asserting it, the repeal of the statute does not affect it or an action for its enforcement. It has become a vested right, which stands independent of the statute.” But here the essential act to be done did not depend, as to its performance, upon the state of things existing at the date of the contract, but upon their condition at the time of performance; and as the condition is now impossible to be performed, and is wholly dependent upon complainant’s recovery in this suit, and could not be enforced until after such recovery, the right to enforce such performance would not be absolutely vested until a decree, and no decree can be pronounced for the reason that it would be a violation of the supreme law to declare that the negroes shall be delivered as slaves. The alternative in the bond, of paying the value of the property attached, should not be enforced for the like reason, as the leading object of the bond was to enforce the delivery of the slaves levied upon. The cases of Coward v. Thompson, 4 Col., 442, and Polk v. Pledge, 5 Col., 384, are not in conflict with this view, as it was held in both that the defendants undertook by their contracts to bear the loss; but the question *682 in this case is not, literally, who shall bear a loss, but whether a party shall be compelled specifically to perform a contract, the performance of which has become impossible by act of law. The complainant’s right to demand a performance depends upon the state of the law now existing. He has no right to ask a delivery of the slaves until he obtains a decree, and when he so asks, it is a sufficient defense to answer that slaves have ceased to be property — against the will, perhaps, of both parties — and that it is now unlawful, as well as impossible, to perform the contract. It is just as impossible as if the slaves had died a natural death by the fiat of the Almighty.
If this view of the law were doubtful, it is clear that, as the attachment was not returned to Court, the bond taken under it can not be the foundation of any proceeding in this Court. It forms no part of the record in this cause. The bill itself does not state that it contains the first application for an attachment as required in the Code, s. 4435, and it may be doubted whether the cause shown was sufficient to create any lien on the property. See Acuff v. Read, 3 Head, 933. Without deciding that it did not, ss. 3512, 773, 774, of the Code, to which we have been referred, evidently relate to bonds executed in the course of judicial proceedings and properly filed; but the bond in this case, can not be so regarded, as it wants the essential elements of having been executed in a judicial proceeding, in the failure of the Sheriff to return the attachment and bond as required by law.
In consequence of the discharge in bankruptcy of *683 Kenneth. B. Lanier and Lovick B. Lanier, no decree can be pronounced against them; but an account, as to one or both of them, is necessary to a final distribution of the fund in the Master’s hands, arising from a sale of the property.
Beverse the decree of the Chancellor, and remand the cause to the Chancery Court at Bipley, where an account will be taken in conformity to this opinion. The costs in this Court will be paid by complainant, and in the Court below as the Chancellor may direct.