[In Bank.—November 17, 1882.]

## THE NEVADA BANK OF SAN FRANCISCO, PETITIONER, *v.* CHARLES STEINMITZ, TREASURER OF THE COUNTY OF SANTA CRUZ, RESPONDENT.

SUBSIDY—RAILROAD—SUPERVISORS—BONDS.—At an election duly held in the county of Santa Cruz, the board of supervisors were authorized by a vote of the electors to grant the aid of the county to a company for the construction of a railroad upon terms which might appear to them advantageous to the county, and to issue bonds for that purpose for a certain amount for every mile of the track that should be actually constructed. The proposition submitted to the people, and voted upon by them, specified the termini of the proposed road. The road was only constructed over a portion of the distance between the points named. *Held,* that the issuing of bonds by the board to an amount corresponding with the completed portion of the road was not in excess of its power, and that the bonds are valid.

ID.—ACQUIESCENCE.—In determining the validity of bonds issued by a county after a vote of the electors authorizing the issue, it is a circumstance of great weight that for a period of more than four years all parties interested in the matter recognized the validity of the bonds, and the authority of the board of supervisors to issue them. (SHARPSTEIN, J., ROSS, J., and McKINSTRY, J.)

STATUTES—EFFECT OF REPEALING ACT—PART PERFORMANCE.—The repeal of the Act of April 4, 1870, which authorized the issuing of bonds in aid of railroads in certain cases, did not affect the validity of bonds issued under a contract which was made and partially performed prior to the passage of the repealing act.

UNILATERAL CONTRACT—PROMISE—PERFORMANCE.—One who promises to pay a sum of money upon the rendition of certain services is liable upon his contract when the services have been rendered, although there was no contemporaneous agreement to perform on the part of the promisee. (MORRISON, C. J.)

PETITION for a writ of mandate to compel the respondent, treasurer of Santa Cruz County, to pay the coupons of certain railroad bonds issued by the county.

The facts are stated in the opinion of the court.

*McAllister & Bergin,* for Petitioner.

The respondent is estopped, as against the petitioner, from questioning the validity of the bonds. (Subd. 3, § 1962, Code. Civ. Proc.; *State* v. *Van Horne,* 7 Ohio St. 331; *Shoemaker* v. *Goshing Township,* 14 Ohio St. 587; *Society for Savings* v. *City of New London,* 29 Conn. 193; *Supervisors* v. *Schenck,* 5 Wall. 782; *Pendleton County* v. *Amy,* 13 Wall. 305; *McKee* v. *Vernon Co.* 3 Dill. 211; *County of Ray* v. *Vansycle,* 6 Otto, 686; *Rogers* v. *Burlington,* 3 Wall. 667; *Luling* v. *City of Racine,* 1 Biss. 318; *Moore* v. *Mayor,* 73 N. Y. 244; *Commissioners* v. *Bolles,* 4

Otto, 206 ; Jones on Railroad Securities, § 280.) The petitioner is a *bona fide* purchaser. (*San Antonio* v. *Mehaffy*, 6 Otto, .314 ; *Cromwell* v. *County of Sac.* 6 Otto, 59 ; *Commissioners* v. *Bolles*, 4 Otto, 109 ; 1 Story's Eq. Jur. § 409 ; Perry on Trusts, § 222 ; Wade on Notice, § 62 ; *Murray* v. *Lardner*, 2 Wall. 121 ; *Belmont Branch Bank* v. *Webb*, 57 N. Y. 68 ; *Welch* v. *Sage*, 47 N. Y. 147 ; *Dutchess County Ins. Co.* v. *Hatchfield*, 73 N. Y. 228.) A grant of power to a board to deal with a subject-matter generally empowers it to make all contracts, and do all acts in regard thereto as an individual might. (*City of Memphis* v. *Brown*, 1 Flip. 198 ; *Ketchum* v. *City of Buffalo*, 14 N. Y. 363 ; *Tucker* v. *Virginia City*, 4 Nev. 27 ; *Douglas* v. *Virginia City*, 5 Nev. 151 ; *Filton* v. *Hamilton City*, 6 Nev. 200 ; *Little Rock* v. *National Bank*, 8 Otto, 314 ; *Hitchcock* v. *Galveston*, 6 Otto, 348 ; *Damon* v. *Granby*, 2 Pick. 351 ; *Coldwater* v. *Tucker*, 36 Mich. 478 ; *Peterson* v. *Mayor*, 17 N. Y. 455 ; *People* v. *Brennan*, 39 Barb. 545 ; *Railroad Co.* v. *Leavenworth*, 1 Dill. 398 ; *Nor. C. Railroad Co.* v. *Mayor & C. C. of Balt.* 24 Md. 492 ; *Gelpcke* v. *City of Dubuque*, 1 Wall. 206 ; *Douglass* v. *County of Pike*, 101 U. S. 686.) The petitioner is a *bona fide* purchaser of the bonds and is protected. (*Orleans* v. *Platt*, 9 Otto, 682 ; *Lyons* v. *Munson*, 9 Otto, 685 ; *Commissioner of Knox County* v. *Aspinwall*, 21 How. 545 ; *Bissell* v. *City of Jeffersonville*, 24 How. 298 ; *Moran* v. *Commissioners of Miami County*, 2 Black, 724 ; *Mercer* v. *Hacket*, 1 Wall. 92 ; *Meyer* v. *City of Muscatine*, 1 Wall. 393 ; *Rogers* v. *Burlington*, 3 Wall. 667 ; *Mayer* v. *Lord*, 9 Wall. 414 ; *Pendleton County* v. *Amy*, 13 Wall. 305 ; *City of Lexington* v. *Butler*, 14 Wall. 296 ; *Grand Chute* v. *Winegar*, 15 Wall. 371 ; *Lynde* v. *The County*, 16 Wall. 13 ; *St. Joseph Township* v. *Rogers*, 16 Wall. 665 ; *Chambers County* v. *Clews*, 21 Wall. 321 ; *Town of Venice* v. *Murdock*, 2 Otto, 498 ; *Town of Coloma* v. *Eaves*, 2 Otto, 487 ; *Commissioners* v. *Bolles*, 4 Otto, 100 ; *Town of East Lincoln* v. *Davenport*, 4 Otto, 801 ; *San Antonio* v. *Mehaffy*, 6 Otto, 314 ; *County of Ray* v. *Vansycle*, 6 Otto, 688 ; *County of Warren* v. *Marcy*, 7 Otto, 104 ; *County of Macon* v. *Shores*, 7 Otto, 278 ; *County of Daviess* v. *Huidekoper*, 8 Otto, 102 ; *Block* v. *Commissioners*, 9 Otto, 696 ; *Wilson* v. *Salamanca*, 9 Otto, 503 ; *Hackett* v. *Ottawa*, 9 Otto, 95 ; *Town of Weyauwega* v. *Ayling*, 9 Otto, 118 ; *County of*

*Tipton* v. *Locomotive Works*, 13 Otto, 539 ; *Harter* v. *Kernochan*, 13 Otto, 570; *Thompson* v. *Perine*, 13 Otto, 810; 1 Dillon on Mun. Corp. §§ 521, 537; Jones on Railroad Securities; §§ 187, 294; Burroughs on Public Securities, § 299.) The repeal of subsidy laws does not impair the rights of the parties under the contract. (*Steamship Company* v. *Joliffe*, 2 Wall. 450; *Hawthorne* v. *Calef*, 2 Wall. 21; *Osborn* v. *Nicholson*, 13 Wall. 662 ; *Creighton* v. *Prag*, 31 Cal. 118 ; *County of Moultre* v. *Savings Bank*, 2 Otto, 635; *Walker* v. *Whitehead*, 16 Wall. 317; *The Twenty Per Cent Cases*, 20 Wall. 187.)

*William D. Storey*, and *Joseph H. Skirm*, for Respondent.

The respondent was not estopped from denying the validity of the bonds. (*Town of Wellsboro* v. *N. Y. & C. R. R. Co.* 76 N. Y. 185; *People* v. *Smith*, 45 N. Y. 773; *People* v. *Hulburt*, 46 N. Y. 110 ; *People* v. *Knowles*, 47 N. Y. 415 ; *People* v. *Spencer*, 55 N. Y. 1; *People* v. *Smith*, 55 N. Y. 135; *Horton* v. *Town of Thompson*, 71 N. Y. 513; *Town of Venice* v. *Woodruff*, 62 N. Y. 462; *People* v. *Mead*, 24 N. Y. 114; *Cagwin* v. *Hancock*, 84 N. Y. 532; *McCoy* v. *Briant*, 53 Cal. 247.) There can be no *bona fide* holders of municipal bonds that were issued without authority. (*Marsh* v. *Fulton County*, 10 Wall. 676 ; *Town of Concord* v. *Portsmouth Savings Bank*, 2 Otto, 625; *Township of East Oakland* v. *Skinner*, 4 Otto, 255 ; *Town of South Ottawa* v. *Perkins*, 4 Otto, .269; *McClure* v. *Township of Oxford*, 4 Otto, 429 ; *County of Bates* v. *Winters*, 7 Otto, 83; *Anthony* v. *County of Jasper*, 11 Otto, 693 ; *Buchanan* v. *Litchfield*, 12 Otto, 278; *Louisiana* v. *Wood*, 12 Otto, 294; *Wells* v. *Supervisors*, 12 Otto, 625 ; *Ogden* v. *County of Daviess*, 12 Otto, 634; *Allen* v. *Louisiana*, 13 Otto, 80; *Weightman* v. *Clark*, 13 Otto, 256; *Jarrolt* v. *Moberly*, 13 Otto, 580; *Williams* v. *Louisiana*, 13 Otto, 637 ; *Durkee* v. *Board of Liquidation*, 13 Otto, 646 ; *School District* v. *Insurance Co.* 13 Otto, 707; *R. R. Co.* v. *Falconer*, 13 Otto, 821.)

MORRISON, C. J. — By an act approved April 4, 1870, the legislature authorized the several counties of this State to aid (under certain conditions and qualifications) in the construction of railroads by the issue of county bonds payable within twenty

years, and bearing interest not to exceed seven per cent per annum. The second section of the act provides that before the granting of such aid the board of supervisors of the county proposing to grant such aid shall submit to the qualified electors thereof the question whether such railroad aid shall be granted, and directs that a notice of the election as therein provided for shall be given. It further provides that no such aid shall be granted "unless a majority of the electors voting at such election shall cast their votes in favor of such aid." In pursuance of the provisions of the act referred to, the board of supervisors of the county of Santa Cruz, at a regular meeting held on the 25th day of September, 1872, passed and duly entered in its minutes the following order :—

"Whereas, the board of supervisors of Santa Cruz County, State of California, propose that said county shall aid in the construction of a railroad of not less than a three-foot gauge, and beginning at or near the Pajaro depot, on the Southern Pacific Railroad, in the county of Monterey, and running thence in the most practicably direct route through the county of Santa Cruz, crossing the Pajaro River near Watsonville, and crossing the San Lorenzo River between the county road leading to Soquel and the bay of Monterey, and thence along or near the coast to the boundary of said county, near the southeast corner of the Point New Year's Ranch, by the issue of county bonds, payable within twenty years, and bearing interest, payable semi-annually, at the rate of seven (7) per cent per annum, to the amount of six thousand dollars per mile, but not exceeding in the aggregate the sum of two hundred and forty thousand dollars, such aid to be in lieu of the aid of one hundred thousand dollars heretofore authorized to be granted in the construction of a railroad connecting the town of Santa Cruz with the Southern Pacific Railroad; and, whereas, the Santa Cruz and Watsonville Railroad Company have agreed that the contract entered into by said company with the said county, dated January 18, 1872, and entered on the records of said board, in vol. 3, page 184, and following, shall be deemed canceled in case the railroad aid herein proposed shall be granted. Now, therefore, it is ordered, and notice is hereby given, that at the next general election, to be held on the 5th day of November, 1872,

there shall be submitted to the electors of Santa Cruz County, the question whether the board of supervisors of Santa Cruz County, in lieu of the aid of one hundred thousand dollars, heretofore authorized to be granted in the construction of a railroad connecting the town of Santa Cruz with the Southern Pacific Railroad, at or near the town of Watsonville, and upon the cancellation of the said contract of the said county with the Santa Cruz and Watsonville Railroad Company, shall be authorized to grant upon terms which appear to them advantageous to the county, the aid of the county of Santa Cruz in the construction of a railroad of not less than a three-foot gauge, on the route hereinbefore described, to an amount of not exceeding in the aggregate the sum of two hundred and forty thousand dollars, in the bonds of Santa Cruz County, as proposed by said board, to be issued at the rate of not more than six thousand dollars per mile, for every mile of main track actually constructed; all ballots cast in favor of said proposition shall contain the words 'Railroad Aid, Yes,' all ballots cast against said proposition shall contain the words 'Railroad Aid, No.'    Said election shall be held in all the election precincts in said county, . . . . which order was published for the period of thirty days in two newspapers printed and published in the county of Santa Cruz, in accordance with such notice."

On the 5th day of November, 1872, a general election was held in the county of Santa Cruz, and at such election a majority of the electors voting cast their votes in favor of granting aid to the railroad mentioned in said order, and on the 11th day of that month the board of supervisors, after canvassing the votes, published and declared that a majority of the electors voting at such election cast their votes in favor of granting the railroad aid mentioned in said order, and thereupon caused the proper record thereof to be entered in the "Minute Book" of its proceedings.    On the 15th day of June, 1873, the board of directors of the Santa Cruz Railroad Company (the same being a corporation duly organized and existing under the laws of this State) passed a resolution authorizing the president of the company to apply to the board of supervisors for aid in the construction of its road at the rate of six thousand dollars per mile in county bonds, and on the 4th day of August, 1873, the board

of supervisors of the county of Santa Cruz and the Santa Cruz Railroad Company executed the following agreement:—

"This contract made and entered into on the fourth day of August, A. D. 1873, by and between the county of Santa Cruz, in the State of California, acting by and through the board of supervisors of said county, as the party of the first part, and that certain corporation, organized, acting, and existing under and by virtue of the laws of said State, and known, designated, and called the Santa Cruz Railroad Company, as the party of the second part.

"Witnesseth, that the board of supervisors of said county having, by an order duly made on September 25, 1872, and recorded at large in volume 3, pages 236, 237, 238, of the minutes of the proceedings of said board, proposed that said county shall aid in the construction of a railroad of not less than a three-foot gauge, the route of which road is definitely described in said proceedings as beginning at or near the Pajaro depot on the Southern Pacific Railroad; thence running in the most practically direct route through the counties of Monterey and Santa Cruz, crossing the Pajaro River near Watsonville, and crossing the San Lorenzo River between the county road leading to Soquel and the bay of Monterey; and thence along or near the coast to the boundary of said county near the southeast corner of the Point New Year's Rancho, by the issue of county bonds, payable within twenty years, and bearing interest, payable semi-annually, at the rate of seven per cent per annum, to the amount of six thousand dollars per mile, but not exceeding, in the aggregate, the sum of two hundred and forty thousand dollars; such aid to be in lieu of the aid of one hundred thousand dollars heretofore authorized to be granted in the construction of a railroad connecting the town of Santa Cruz with the Southern Pacific Railroad; and the board of supervisors of said county, under and in pursuance of an act of the legislature of said State, approved April 4, 1870, and entitled 'an act to empower the board of supervisors of the several counties of the State to aid in the construction of a railroad in their respective counties,' and of the Act of April 4, A. D. 1870, supplemental thereto, having, at the election held in said county on the 5th day of November, A. D. 1872, of which election at least thirty

days' notice was given by publication once a week in a news-
paper printed and published in said county, which notice stated
the day on which, and the places where, such election was to be
held in said county, and the amount of bonds of said county to
be issued for railroad aid, and definitely described the route of
the railroad for which aid was proposed, submitted to the qual-
ified electors of said county the question whether such railroad
aid shall be granted by said county to aid in the construction of
a railroad on the route hereinbefore described; and at such elec-
tion a majority of the electors voting at such election having
cast their votes in favor of such railroad aid, and the result of
said election, after a full and fair canvass by said board, having
been declared by said board to be in favor of granting such
railroad aid, and the sum of two hundred and forty thousand
dollars, authorized by the said votes as aforesaid, to be granted
in and to such railroad, being less than five per cent of the.
value of the taxable property of said county, and no aid what-
ever to any railroad ever having been granted by said county;
and a certain agreement dated January 18, A. D. 1872, between
said county and the board of supervisors thereof, and the Santa
Cruz and Watsonville Railroad Company, having been fully
and forever canceled and annulled, and said county released and
discharged from all liability thereunder, and covenants therein;
and the said party of the second part, having been heretofore
duly organized as a corporation under the laws of said State for
constructing and maintaining a railroad on the entire route first
hereinbefore mentioned and described, and proposing to con-
struct on said route, first, the section of such railroad between a
point at or near said Pajaro depot and a point on the westerly
side of said San Lorenzo River, and within the corporate limits
of the town of Santa Cruz, which point last referred to is here-
after to be located by said party of the second part; and said
party of the second part having solicited the said board to grant
the aid of said county in the construction of such railroad, and
the terms offered by said party of the second part appearing to
said board to be advantageous to said county, and it appearing
that said county will be greatly benefited by the construction of
such railroad, or any part thereof; now, therefore, this contract
witnesseth, that in consideration of the premises and of the

agreements herein named, to be done and performed by said party of the second part, the said party of the first part has agreed and hereby does agree with said party of the second part, to issue, deliver, and donate unto said party of the second part, in aid of the construction of such railroad, bonds of the said county of Santa Cruz, in amounts and at the times, and upon the terms as herein stated; said bonds, as herein provided, shall be payable in gold coin to said party of the second part, and to the holders of such bonds within twenty years from the date of their issue, at the office of the treasurer of said county, and shall bear interest in like coin at the rate of seven per cent per annum, and the instalments of interest shall be payable semi-annually on the first Mondays of January and July of each year on coupons to be issued and delivered with such bonds, and each of such bonds shall be of the denomination of not less than one hundred dollars, nor more than one thousand dollars, signed by the chairman of said board and by the treasurer and clerk of said county and under the seal of said county, the interest coupons to be signed by the treasurer and clerk of said county. Such bonds are to be prepared for signing in the following form, to wit: Number ——. State of California. —— dollars. Bond of the county of Santa Cruz," etc., etc.

The contract further provides that when five miles of the road are completed, and a construction train has been run over the same, there shall be issued to the company bonds of the county to the amount of thirty thousand dollars, and upon the construction of every mile of the track thereafter, and the passage of a construction train over the same, there shall be issued to the railroad company bonds of the county to the amount of six thousand dollars. The contract then proceeds to provide for a notice to be given of the construction of the road as it progressed, for an examination and inspection of the same, for an acceptance thereof by the county, and for the issue of bonds as the road was built, at the rate of six thousand dollars per mile. There are numerous other clauses in the contract, which it is unnecessary to notice, for the purposes of this opinion.

It appears from the evidence in the case that the railroad company commenced work on the first section of its road, and

prosecuted the work thereon with reasonable diligence until the same was completed from the city of Santa Cruz to the Pajaro depot; that the company built a bridge over and across the San Lorenzo River; that the road was constructed in the manner provided for and in accordance with the contract; that a construction train was run over the road; that it was inspected by the board of supervisors; that it was duly accepted, and the board of supervisors, on the 9th day of December, 1874, ordered that thirty thousand dollars of the bonds of the county be issued to the company.

It further appears that on or about the 11th day of December, 1874, a suit was commenced by one William H. Patterson in the District Court of the Twentieth Judicial District against the board of supervisors of the county of Santa Cruz, praying for an injunction to restrain and enjoin the defendants from issuing to the railroad company any bonds on account of the construction of said road, and thereupon an injunction was issued in pursuance of the prayer of the complaint. The case of *Patterson* v. *The Supervisors* was afterwards tried upon its merits, and on the 23d day of February, 1876, a decree was entered therein declaring that the proceedings of the board were legal and valid; that the issuance of the bonds should not be in any manner restrained or enjoined, and thereupon the injunction previously issued was dissolved.

After the judgment of the Twentieth District Court, dissolving the injunction referred to above, that is to say, on or about the 25th day of February, 1876, the board of supervisors of Santa Cruz County issued and delivered to the Santa Cruz Railroad Company thirty thousand dollars of bonds, each of which was in the following form: —

"In pursuance of an act of the legislature of the State of California, entitled ' an act to empower the board of supervisors of the several counties of the State to aid in the construction of a railroad in their respective counties,' approved April 4, 1870, and of an act supplemental thereto, approved April 4, 1870, and in accordance with the terms of a contract entered into by the board of supervisors of said county on the 4th of August, 1873, with the Santa Cruz Railroad Company, which said contract is entered upon the minutes of the board of

supervisors in volume 3, pages 279, 280, 281, 282, 283, 284, 285, 286.

"The county of Santa Cruz owes and will pay at the office of the county treasurer in the town of Santa Cruz, State of California, to the Santa Cruz Railroad Company, or the holder of this bond, within twenty years from the date of these presents, the sum of one thousand dollars in United States gold coin, with interest thereon at the rate of seven per cent per annum in like gold coin, from the date hereof until paid; interest payable semi-annually on the first Mondays of January and July of each year, on the surrender to said county treasurer of the coupon for said interest."

The coupon attached to each of the bonds is in the following form:—

"Coupon No. 41. On the 23d day of February, A. D. 1896, the county of Santa Cruz will pay to the Santa Cruz Railroad Company, or bearer, at the county treasurer's office, ten and twenty-one one-hundredths dollars in United States gold coin, interest due on bond No. 1."

On the 20th day of March, 1875, and at divers times between that date and the 15th day of November of that year, the Santa Cruz Railroad Company presented and filed with the board of supervisors written notices and communications informing them of the completion of fourteen additional miles of the road, and thereupon proceedings were regularly taken by the board to inspect and examine the same, and after such examination and inspection the following order was passed:—

"It is therefore ordered by the board of supervisors of the county of Santa Cruz, that there be issued and delivered to the Santa Cruz Railroad Company bonds of said county of Santa Cruz to the amount of eighty-four thousand dollars, in sums of one thousand dollars each, payable within twenty years of their date in United States gold coin, and bearing interest in like coin, at the rate of seven per cent per annum from their date, and interest payable semi-annually on the first Mondays of January and July of each year, in pursuance of the terms of said contract between the county of Santa Cruz and the Santa Cruz Railroad Company, and that said bonds be signed by the chairman of this board and by the county treasurer and county

clerk, and under the seal of said county, and the interest coupons to be signed by said treasurer and said clerk.

It is further ordered that each of the bonds issued to the said railroad company under said contract shall be of the denomination of one thousand dollars."

In pursuance of the above order, bonds were issued to the Santa Cruz Railroad Company to the amount of eighty-four thousand dollars. These bonds were in form similar to the bonds for thirty thousand dollars previously issued to the railroad company

All of these bonds were, within three months from the issuance thereof, sold and disposed of by the railroad company, and on the 2d day of August, 1879, they were purchased and paid for by the plaintiff, the Nevada Bank of San Francisco, in the ordinary course of business, at the rate of ninety-five cents on the dollar, and were purchased under the belief that the same were legal and valid.

On the 3d day of January, 1881, the coupons on the bonds which fell due on the first of that month, were presented to the defendant, the treasurer of the county of Santa Cruz, and payment thereof was demanded, which was refused by the defendant, although he at that time had sufficient funds on hand specially provided by law for that purpose, to pay said coupons; and this is an application to the court for a peremptory writ of mandamus to compel the defendant as treasurer of said county to pay such coupons.

There are other facts presented by the pleadings and report of the referee to whom this case was referred for the purpose of taking and reporting the facts therein, but we deem it unnecessary to consider them.

The question presented for our decision is simply this : Are the bonds in the hands of the plaintiff, claiming the same as a *bona fide* purchaser for value, valid and binding upon the county of Santa Cruz?

The Act of April 4, 1870, as appears from its title, as well as from its clearly expressed object, was intended to "empower the board of supervisors of the several counties of the State to aid in the construction of a railroad in their respective counties," and the only restrictions imposed upon the board were that the

bonds to be issued for such aid should not exceed five per cent of the value of the taxable property of the county, and further that the question of granting such aid should be submitted to the qualified electors of the county in pursuance of section 2 of the act. The question of granting such aid was submitted to the voters of the county of Santa Cruz, and the proposition was for a road "beginning at or near Pajaro depot on the Southern Pacific Railroad in the county of Monterey, and running thence in the most practicably direct route through the county of Santa Cruz, crossing the Pajaro River near Watsonville, between the county road leading to Soquel and the bay of Monterey, and thence running along or near the coast to the boundary of said county, near the southeast corner of Point New Year's Ranch," and the order was : —

"Now, therefore, it is ordered and notice is hereby given that at the next general election to be held, etc., there shall be submitted to the people the question whether the board of supervisors shall be authorized to grant, upon terms which may appear to them to be advantageous to the county, the aid of the county of Santa Cruz, as follows: When five miles of said first section of said railroad shall have been constructed and a construction train run over the same, there shall be issued and delivered to said party of the second part by the said party of the first part, bonds of said county to the amount of thirty thousand dollars, and upon the construction of every mile of track thereafter of such railroad, and the passage of a construction train over the same, there shall be issued and delivered as last aforesaid, to the said party of the second part, bonds of said county to the amount of six thousand dollars, and so on until the construction of said railroad is completed"; and it was provided in the proposition submitted to and adopted by the vote of the people, that bonds should be issued at the rate of not more than six thousand dollars *for every mile of main track actually constructed.* It is claimed on behalf of defendant, first, that the contract was an unilateral one, and therefore not binding upon the county; second, that the board of supervisors had no power to enter into a contract for the construction of a railroad which did not extend over the entire route from Pajaro depot on the south to Point New Year's Ranch on the north;

and third, that the Act of 1870 was repealed before the bonds were issued.

If the contract did not contain any stipulation on the part of the railroad company to build the road or to do any other act, we can see no good reason why the party of the first part should not be bound by its promise or agreement, provided the railroad company, acting upon such promise or agreement, proceeded to construct the road in accordance with the conditions set forth in the contract. It may be that the county could have withdrawn its promise of aid at any time before work was done on the faith of the promise; but after the work was done and the contract was executed, the county could not escape from its liability on the ground that the company did not in the first instance obligate itself to construct the road. If A. promise B. to pay him a stipulated sum for a certain service, and B. renders the service without any contemporaneous promise to do so, can it be doubted that A. will be bound by his promise? The following authorities are referred to in support of the point that the contract was binding on the county after performance by the company *even if it was unilateral.* (*Barnes* v. *Perine*, 9 Barb. 211 ; *Robertson* v. *March*, 3 Scam. 198 ; Chitty on Contracts, 64 ; *Train* v. *Gold*, 5 Pick. 379 ; *White* v. *Baxter*, 71 N. Y. 254.)

But is it true that the railroad company did not agree or promise to do anything on its part? The contract contains the following agreement or promise by the company : "And the said party of the second part (the company) has agreed and hereby does agree to and with the said party of the first part, to build, construct, and finish such last-named bridge (across the San Lorenzo River), and to lay the track of said railroad from the easterly bank of said last-named river to a point on the westerly side thereof within three hundred feet of said bay, in three months after said bonds of said county to the amount of ninety thousand dollars shall have been issued and delivered to said party of the second part." There is also a clause in the contract to the effect that the aid is granted in lieu of a former aid of one hundred thousand dollars, which is surrendered and canceled by the express terms of the contract. Here we find a sufficient consideration, if any were necessary, for the promise on the part of the county.

The second point made on behalf of the defendant involves an attack upon the contract, on the ground that the board of supervisors had no power to make it, because it did not provide for, and the Santa Cruz Railroad Company was not bound under it to construct the road *along the entire route.*

In this connection it is proper to notice the fact that the Act of April 4, 1870, does not provide for a contract between the county and the railroad company, but simply empowers the county to aid in the construction of railroads upon certain terms. The aid authorized by the law, and intended by the parties, was to be granted as the work progressed, in order to assist and enable the company to pay for the work and construct the road, and it never was contemplated that the entire work should be completed and paid for by the company before the bonds should be issued. (*Kenicott* v. *Supervisors,* 16 Wall. 466.) This would not be aiding the company in the construction of the road, but would simply be reimbursing the company, in whole or in part, its money expended in building the road. This view is fortified by the proposition submitted to the electors, which was, that the county should aid the railroad company in the construction of its road by issuing and delivering to it bonds " *at the rate of not more than six thousand dollars per mile for every mile of main track actually constructed.*" The bonds should have been issued for every mile when constructed (after the completion of the first five miles), and it is fair to presume that they would have been so issued if the board had not been enjoined by the order of the Twentieth District Court.

The Bank of Nevada purchased the bonds for value, without notice of any infirmity in them, and the only question is one of *power* in the board to issue them. (*Cromwell* v. *The County of Sac,* 96 U. S. 51 ; 1 Dillon Mun. Corp. § 515, and authorities there cited.) If the board did not have the *power* to issue the bonds there could be no such thing as a *bona fide* holder of them, as any purchaser would be held to have notice of the fact, where there was a total want of authority." (*Township of East Oakland* v. *Skinner,* 94 U. S. 258.) "The following doctrines are too well settled to be any longer open to question. A *bona fide* purchaser of negotiable paper for value before maturity takes it freed from all infirmities in its origin, unless it is absolutely

void for want of power in the maker to issue it, or its circulation is by law prohibited. Municipal bonds payable to bearer are subject to the same rules as other negotiable paper." (1 Dillon on Mun. Corp. § 113, and authorities there cited.) Speaking further on this subject, the same author says: "The Supreme Court of the United States has upheld the rights of the holders of municipal securities with a strong hand, and has set a face of flint against repudiation." (1 Dillon on Mun. Corp. § 518.) "It [the Supreme Court of the United States] has adopted when necessary to protect the *bona fide* holders of such securities, liberal construction of statutes and charters authorizing the creation of such debts. Against such holders it has given no favor to defenses based upon mere irregularities in the issue of the bonds or non-compliance with preliminary requirements, not going to the question of power to issue them." (1 Dillon on Mun. Corp. § 515.)

It is claimed in the case now under consideration that there was a want of power on the part of the board of supervisors to make any contract or to issue any bonds for a portion of the road, and that is the only ground upon which the question of power can arise. There is no charge of fraud or unfair dealing on the part of the board, and the most that can be said against its action is that it provided in the first place for the construction of that section of the road lying between the city of Santa Cruz and the Pajaro depot. In this we can perceive no just cause of objection or complaint, for that was the most important section of the road ; and its completion brought a large portion of the county of Santa Cruz into direct communication with the Southern Pacific Road, and thereby opened a lengthy line of travel north and south with other portions of the State.

It does not appear that there was not an intention on the part of the board of supervisors to extend the road in a northerly direction from Santa Cruz to its northerly terminus, and after appropriating one half of the two hundred and forty thousand dollars of the bonds to the first section of the road — about one half of the entire route — there remained to be issued a corresponding amount of bonds to aid in the construction of the other half of the railroad.

It remains only for us to say that in our opinion the bonds

were not issued without power, that they were valid when issued, and are good and binding upon the county in the hands of the plaintiff.

There is but one other question to be determined, and that relates to the effect of the Act of January 14, 1874, repealing the Act of April 4, 1870. This question has been passed upon in several cases. It is found in the report of the referee that the Santa Cruz Railroad Company commenced work on its road, under the contract between it and the county, on the 25th day of October, 1873, and prosecuted the same with reasonable diligence; but the repealing act was not passed until January 14, 1874. In view of the facts of this case the validity of the bonds was not affected by the repeal of the Act of April 4, 1870. (*Town of Concord* v. *Savings Bank,* 92 U. S. 630; *Steamship Company* v. *Joliffe,* 2 Wall. 450; *Montgomery* v. *Kasson,* 16 Cal. 189.)

Let the writ issue.

SHARPSTEIN, J., specially concurring. — The only objection to the validity of the bonds which seems to us to merit any serious consideration is that after a majority of the electors voting upon the proposition to issue bonds to aid in the construction of a railroad upon a certain specified route between two certain specified points had voted in favor of granting such aid, the board of supervisors entered into an agreement whereby said board agreed to issue bonds to the amount of six thousand dollars per mile, for the construction of a railroad on said route for a distance less than the entire distance between the termini mentioned in the proposition submitted to said electors. And that objection is founded upon the hypothesis that it was the understanding of the electors who voted upon the proposition that in consideration of the aid granted the entire road should be constructed.

There is but one way in which we can arrive at the intention of the electors who voted upon the proposition to grant aid, and that is by an inspection of the proposition itself.

The proposition voted upon, as stated in the notice of the election, was substantially as follows: That the board of supervisors should be authorized to grant [in lieu of the aid of one

hundred thousand dollars, previously authorized to be granted in the construction of a railrord connecting the town of Santa Cruz with the Southern Pacific Railroad], *upon terms which might appear to said board advantageous to said county,* the aid of said county "in the construction of a railroad *on the route*" described as "beginning at or near the Pajaro depot, on the Southern Pacific Railroad, in the county of Monterey, and running thence in the most practicably direct route through the county of Santa Cruz, crossing the Pajaro River near Watsonville, and crossing the San Lorenzo River between the county road leading to Soquel and the bay of Monterey, and thence along or near the coast to the boundary of said county near the southeast corner of the Point New Year's Ranch," . . . . "to an amount of not exceeding in the aggregate the sum of two hundred and forty thousand dollars, in the bonds of Santa Cruz County as proposed by said board, to be issued at the rate of not more than six thousand dollars per mile for every mile of main track actually constructed."

The vote was in favor of aiding in the construction of a railroad on a route "beginning at or near Pajaro depot, and ending at the boundary of said county near the southeast corner of the Point New Year's Ranch." And the board of supervisors was authorized "to grant, upon terms which to them" might "appear advantageous to the county," the aid of the county in the construction of a railroad on that route, in the bonds of the county, "to be issued at the rate of not more than six thousand dollars per mile for every mile of main track actually constructed," until the aggregate of the bonds so issued should amount to two hundred and forty thousand dollars.

Now, it is not claimed that so much of the road as has been actually constructed was not constructed on the route designated in the proposition which was submitted to the electors of the county. But it is claimed that the board of supervisors was not authorized to agree to issue bonds at the rate of six thousand dollars per mile, for any number of miles less than the whole number between the terminal points of the route. The board, however, was expressly authorized to grant said aid upon terms which might appear to it to be advantageous to the county, and if it appeared to it to be advantageous to the

county to aid in the construction of nineteen miles and no more of the road constructed on the route designated, it is not the province of this court to review the decision of the board upon that question. We are bound to assume that it appeared to the board to be advantageous to the county to have no more than nineteen miles of that road constructed, at an expense of six thousand dollars per mile to the county, until we are convinced that it appeared otherwise to said board.

The board was not bound to issue bonds at the rate of six thousand dollars per mile for every mile of railroad which might be constructed between terminal points mentioned in the proposition to grant aid. But it was authorized to issue them at the rate of six thousand dollars per mile for every mile of main track actually constructed. And whether it issued them at the rate of six thousand dollars per mile for a part of the distance, or for the entire distance, it was issuing them in aid of the construction of a railroad on the route designated in the proposition upon which the electors had voted. By aiding in the construction of nineteen miles of railroad on the route designated, the county was aiding *pro tanto* in the construction of it from one to the other of the terminal points mentioned in said proposition. If it was the intention of the electors voting upon the proposition to grant the aid of the county in the construction of a railroad upon the route specified, that said aid should not be granted except upon the condition that a railroad should be constructed the entire length of the route, it must be admitted, we think, that they have failed to express that intention. And if they have, it is no part of the duty of this court to supply the omission. It is our duty to construe the contract which the parties have made, not to make on for them.

The construction which we have put upon the vote of a majority of the electors who voted upon the proposition to issue bonds in aid of the construction of said railroad, is in accord with that which the board of supervisors practically put upon that vote; and the people of said county acquiesced in that construction for a considerable period of time by offering no resistance to the issuing of the bonds, and by paying the interest upon them semi-annually for a period of more than four years, three of which preceded the purchase of said bonds by

the petitioner herein.   It is not necessary to invoke the doctrine
of "municipal decision," or of estoppel, of which it is one of the
forms, to the extent that it has been applied by the Supreme
Court of the United States to cases involving the validity of
municipal bonds, in order to sustain the validity of these bonds.
In a late treatise on public securities the author says: "It has
often happened in the cases which have come before the
Supreme Court of the United States, that the municipalities
which sought to evade the force of the bonds issued on their
behalf, had received the proceeds of the bonds, enjoyed the ben-
efits of the improvements made by them, paid the interest for
many years, and these circumstances as well as the doctrine of
municipal decision have influenced the court in their determina-
tions."    And then adds: "It is not, however, against these
decisions when these different elements are combined, that we
make our protest."    (Burroughs on Public Securities, p. 341.)
In addition to those enumerated in the above extract there is in
this case another very important element, and that is that it
was made a condition, precedent to the issuing of any bonds to
aid in the construction of said railroad, that a certain contract
by which said county had agreed with the Santa Cruz and Wat-
sonville Railroad Company to aid it to the extent of one
hundred thousand dollars, "in the construction of a railroad
connecting the town of Santa Cruz with the Southern Pacific
Railroad, at or near the town of Watsonville," should be can-
celed; and it appears by a recital in the agreement between the
board of supervisors and the Santa Cruz Railroad Company,
that said contract with the Santa Cruz and Watsonville Rail-
road Company was "fully and forever canceled and annulled,
and said county released and discharged from all liability there-
under, and covenants therein."    That liability amounted to
within fourteen thousand dollars of the whole amount of the
bonds held by the petitioner.   And it is not even suggested that
the liability so canceled can be restored so as to place the parties
in the same condition that they were in prior to its cancellation.
Does not that present a case for the application of the principle
of estoppel?

If that principle can be applied to a municipality, it is diffi-
cult to conceive of a case to which it could be applied more

properly than to the one at bar. Here a majority of the electors voted in favor of a proposition which will at least admit of the construction which all of the parties interested in it practically put upon it for a period of four or five years by issuing the bonds and paying interest thereon, and now, after said bonds, which are negotiable, have passed through several hands, this court is asked to hold that such construction was erroneous, and that the petitioner, who paid their full market value, should have made that discovery before purchasing them, although it does not appear that any tax-payer, supervisor, treasurer, or legal adviser of the county made it until some time afterwards.

That which it is now claimed constituted a condition precedent to the power to issue the bonds, is certainly not clearly expressed in the proposition submitted to the electors, and for which a majority of them voted, and it seems to us inexplicable that if such a condition had been supposed to exist, the board of supervisors should have been permitted to issue the bonds in utter disregard of it, when any tax-payer in behalf of himself and all other tax-payers of the county could have intervened and prevented the issue of them. And it is still more inexplicable to us that under such circumstances the interest on the bonds should have been paid for a period of four or five years without a word of protest from any tax-payer, so far as we are advised. "They had an opportunity, before innocent third persons could be injured or committed to the acts of their public agents, to enjoin the proceeding and protect themselves; they did not seek that protection; but now when they have received all the fruits of the contracts of their agents from third persons who have acted upon their recognition of the authority of their agents, they ask the privilege of denying this recognition, and thus escape from their obligations. It is too late for them to do so as against innocent third persons. They are concluded not simply by acts of their public agents but their own." ᐧ (*State* v. *Van Horne,* 7 Ohio St. 327.)

If the construction of the power conferred upon the board of supervisors, for which the respondent contends was clearly the correct one, we might be compelled to hold that the petitioner was chargeable with notice of the want of authority in the board of supervisors to enter into the agreement which they entered

into with the railroad company. But it is by no means clear that that construction is the correct one, and it is clear that during a period of four or five years all parties interested acted as if it was not the correct one, and we think that in a case like this that circumstance is entitled to great weight.

McKINSTRY, J., concurred.

Ross, J., specially concurring.—I concur upon the second ground discussed in the opinion of MR. JUSTICE SHARPSTEIN and for the reasons by him given.

MYRICK, J., dissenting.—Under the Act of April 4, 1870, (Stats. 1869–70, p. 746), a vote was had authorizing the granting of aid, and a contract had been made between the board of supervisors of Santa Cruz and the Santa Cruz and Watsonville Railroad Company, by which aid to the amount of one hundred thousand dollars was granted to that company to assist in the construction of a railroad from the town of Watsonville to the town of Santa Cruz. For some reason the work did not progress. On the 25th of September, 1872, the board of supervisors made an order for an election to be held upon the proposition of granting aid for the construction of a railroad from a point on the line of the Southern Pacific Railroad, at or near the Pajaro depot, thence through the county of Santa Cruz to the northern line of the county, near Point New Year's Ranch, said aid to be six thousand dollars per mile, and not exceeding the aggregate of two hundred and forty thousand dollars, interest-bearing bonds of the county to be issued therefor; said aid to be in lieu of the aid of one hundred thousand dollars theretofore authorized to be granted. In pursuance of this order an election was held, and the result was in favor of the proposition.

Thereafter, on the 15th of June, 1873, the Santa Cruz Railroad Company made its application for aid. On the 18th of June, 1873, the articles of incorporation of the Santa Cruz Railroad Company were filed, such incorporation being for the purpose of constructing, conducting, and maintaining an iron railroad within the counties of Monterey and Santa Cruz, commencing at a point at or near Pajaro station, on the Southern Pacific Railroad, in the county of Monterey, and running thence

to and through the county of Santa Cruz to the northern boundary of Santa Cruz County at or near the south boundary of the Rancho Puntadel Ano Nuevo (Point New Year's Ranch), the estimated length of said railroad being forty miles.   On the 4th of August, 1873, the board of supervisors received from Santa Cruz and Watsonville Railroad Company a release of the one thousand dollar aid, and on the same day executed a contract with the Santa Cruz Railroad Company, in which was recited the before-mentioned proposition for aid in the construction of a railroad beginning at or near the Pajaro depot, and thence running in the most practicable direct route through the counties of Monterey and Santa Cruz to the boundary of Santa Cruz county near the southeast corner of the Point New Year's Ranch, by the issuance of bonds, the same to be in lieu of the one hundred thousand dollars before authorized; the submission of the proposition to the voters of the county; the election and the vote in favor of the aid; the release of the one hundred thousand dollar aid; the incorporation of the Santa Cruz Railroad Company for the purpose of constructing and maintaining a railroad on the entire route; and the solicitation of the company for aid in the construction of such railroad.   The contract then proceeded to declare that the county would be greatly benefited by the construction of said railroad, *or any part thereof,* and provided for the issuance of bonds at the rate of six thousand dollars per mile as the road should be completed in sections specified; but provided that the western terminus of the work to be done thereunder should be at a point within the corporate limits of the town of Santa Cruz.   The company was authorized to commence its work at a point near the town of Santa Cruz, and prosecute the same easterly to Pajaro station.   It should be noticed that the town of Santa Cruz is about midway between the two ends of the road, as stated in the proposition submitted to the voters.   No provision was made in this contract for the construction of a road beyond Santa Cruz, nor was any reference made thereto, except by the recitals above stated; on the contrary, it is perfectly evident from the contract that the board of supervisors on the one hand, and the railroad company on the other, intended that the same should apply only to that portion of the route between Pajaro and Santa

Cruz.   The work of construction so progressed that on the 7th of December, 1874, the board of supervisors made an order for the issuance of bonds to the amount of thirty thousand dollars. At this point one Patterson brought a suit against the board of supervisors for the purpose of restraining the issuance of the bonds; and such proceedings were had that on the 23d of February, 1875, judgment of nonsuit was entered upon the ground that the plaintiff had failed to prove a sufficient case.   Thereafter, in 1876, the road having been constructed from Pajaro to Santa Cruz, bonds were issued to the Santa Cruz Railroad Company, thirty thousand dollars on the 25th of February, and eighty-four thousand dollars on the 11th of March.   The bonds on their face refer to the Act of 1870, and recite that they are issued "in accordance with the terms of a contract entered into by the board of supervisors of said county on the 4th day of August, 1873, with the Santa Cruz Railroad Company, which said contract is entered upon the minutes of the board of supervisors in vol. 3, pp. 279, 280, 281, 282, 283, 284, 285, 286." On the 7th of August, 1879, the plaintiff purchased the bonds through a broker, having no knowledge of the then holder, paying therefor ninety-five per cent of the par value.

No road has been constructed over any part of the projected route between the town of Santa Cruz and the northern boundary line of the county, nor has such construction been or attempted to be provided for.

This proceeding is a petition for a writ of mandate requiring the respondent as county treasurer, to pay the coupons on the bonds held by petitioner.   The petitioner claims as well, that the bonds were properly issued, and are a legal charge upon the county, as that, it being a *bona fide* holder for value, payment cannot be disputed.

In our opinion the question of the rights of *bona fide* holders of bonds does not arise and is not for consideration in this case. The bonds on their face refer to the statute authorizing the granting of county aid, and to the contract between the board of supervisors and the railroad company.   Therefore the bonds are as though the statute and the contract were written, word for word therein.   The statute authorized the granting of county aid; the election was held thereunder, and the matter

submitted was: Shall aid be granted for the construction of a. railroad from Pajaro to the northern line of the county? Upon that question, *and that question only*, the people voted to grant the aid; for that purpose, and that purpose only, the board of supervisors were authorized to issue bonds; there was *no vote* upon the granting of aid for any less distance; the contract was for " one section " only — from Pajaro to Santa Cruz — about one half the entire distance voted upon. It cannot be pretended that it is or has been the intention of the railroad company to complete the road. It is manifest that it was the intention of the parties who conducted the transaction on the part of the board of supervisors and the railroad company, to take advantage of a vote which had been had for granting aid for the construction of the road for the whole distance, construct the road for only half of the distance, obtain the issuance of bonds for that half, at 'the rate of six thousand dollars per mile (one hundred and twenty thousand dollars for the twenty miles, that probably being the only profitable part to build or operate), and then omit to proceed with the further construction. The contract, which, by being referred to, is a part of each and every bond, refers, also, to the vote of the people in favor of aid for the road the *entire distance* — and then, after so referring, assumes to authorize the railroad company to construct but the part, the track laying to commence at Santa Cruz and extend to Pajaro; no word is written or act provided for, having in view any other or further construction. Such transactions are not fair dealing; and of such, in this case, holders of the bonds are bound to take notice. It is a question of *power*. The board of supervisors had no power to issue bonds to aid in the construction of any quantity or distance of road less than the whole. It acted under a limited and special power of attorney. Possibly bonds might have been issued for miles as the work progressed, but the holders of such bonds would be under the burden of providing for or requiring the entire construction.

 The Supreme Court of the United States in *Township of East Oakland* v. *Skinner*, 4 Otto, 255, says: " We have held that there can be no *bona fide* holding where the statute did not in law authorize the issue of the bonds. The objection in such case goes to the point of power. There is an entire want of

jurisdiction over the subject. It is not the case of an informality, an irregularity, fraud, or excess of authority in an authorized agent. Where there is a total want of authority to issue the bonds, there can be no such thing as a *bona fide* holding."

As was said above, although there was powe. to issue bonds in a certain case, viz., for the construction of the entire distance, yet *there was no power* to issue in aid of the construction of a less distance. That it was the intent of the railroad company to build, and of the board of supervisors to have built, a part only, is clearly manifest from the proceedings. The board declared (see contract between the board and the railroad company): "It appearing that said county will be greatly benefited by the construction of said railroad *or any part thereof.*" The board had not power to declare any benefit from a part. The people had by their votes declared the extent of the line of the road, and the board had no more power to diminish its length than to increase the amount of aid. The intent to avoid compliance with the law is apparent upon the face of the documents referred to in the bonds, and the purchaser was bound to take notice. The bonds were not like a bill of exchange or promissory note, "a courier without luggage"—but these transactions were tied to them and could not be shaken off.

The Supreme Court of the United States, in *School District* v. *Insurance Co.* 13 Otto, 710, said: "As the bonds recite that they were issued under this act [an act which the court held not to give authority for issuing the bonds in question], and that the vote was taken under it, we cannot see that power, purposed to be exercised under other and very different circumstances, can be invoked to give validity to an act which is void by the authority under which it professed to be acting."

It has been repeatedly urged that the holders of bonds have innocently invested their money, and should, as innocent holders of public securities, be protected. They are not, however, the only persons to be considered. Tax-payers are equally innocent; tax-payers are not to be subjected to extraordinary burdens, or even ordinary burdens, except by law.

To this case may be applied the language used by Justice Field, concurred in by Chief Justice Waite and Justices Grier and Miller, in dissenting from the judgment of the court in

*Rogers* v. *Burlington,* 3 Wall. 668: "In all such cases the mode becomes the measure of the power. . . . . This is not a case where the doctrine of estoppel has any application. It is not a case where the purchaser of the bonds was misled by any recitals of conformity to law. Here the statute and the ordinance of the city of Burlington, under which authority to issue the bonds was assumed to exist, are both printed in full in the indorsements upon the bonds; and the ordinance is also referred to in their face. But if this were not so, the case would not be changed, as the statute did not authorize the issue of the bonds. No formality of execution and no extent of recitals could give validity to instruments thus issued."

There are even stronger objections against the validity of the bonds involved in the case at bar than those considered in the case above referred to.

The length of time which elapsed after the making of the contract and the issuance of the bonds, before the purchase of petitioner, may not be a controlling consideration, but it is certainly significant in one respect. The contract was made August 4, 1873, and the bonds were issued in February and March, 1876; the petitioner did not purchase until about three years and a half thereafter, to wit, August 7, 1879. During all that period no step had been taken by the railroad company or the board of supervisors for carrying out the will of the people as expressed in granting the aid.

The petitioner is not in a position to say it was not fully advised of all the proceedings. While it had the proposed purchase of the bonds under consideration, it caused to be examined the Act of April 4, 1870, the popular vote upon the question of extending the aid, the contract between the board of supervisors and the Santa Cruz Railroad Company, and it had 'the bonds before it. It also caused to be examined an action then pending by the railroad company against the board of supervisors for the further issuance of bonds, which action was being resisted upon the ground, among others, that no vote had been had for the granting of aid for any less distance than the whole. The writ should be denied.

McKEE, J., and THORNTON, J., concurred with MYRICK, J.

[NOTE.—After the publication of the foregoing opinions, a writ of error was allowed to the Supreme Court of the United States. The proceedings in that court have lately terminated, without trial there, and the judgment of this court remains in force.]