Mr. Justice FIELD
delivered the opinion of the court.
This case arises upon the act of the State of California, of the 20th of May, 1861, entitled “ An act to establish pilots and pilot regulations for the port of San Francisco.” The act provides for the creation of a Board of Pilot Commissioners, and. authorizes the hoard to license such number of pilots for the port as it may deem necessary, and prescribes their qualifications, duties, and compensation. It makes it a.misdemeanor, punishable by fine or imprisonment, for any person not having a license from the board, to pilot any ship or vessel in or out of the port by way of the “ Heads,” that is by the way which leads directly to and from the ocean. It enacts that “ all vessels, their tackle, apparel, and furniture, and the masters and the owners thereof, shall be jointly and severally liable for pilotage fees, to be recovered in any court of competent jurisdiction.” And it declares, that when a vessel is spoken by a pilot and his services are declined, he shall be entitled to one-half pilotage fees, except when the vessel is in tow of a steam-tug outward bound, in which case no charge shall be made, unless a pilot be actually employed.
On the 1st of November, 1861, the plaintiff in the court below, the defendant in error in this court, was a pilot for the port of San Francisco, having been regularly appointed and licensed by the board created under the act of the State. At that time the steamship Golden Gate was lying in the port, and about to proceed to Panama, carrying passengers and treasure. This vessel was then, and ever since 1852, had been an American ocean steamer, registered at the custom-house, in the port of New York, and exclusively employed in navigating the ocean, and carrying passengers and treasure between San Francisco and Panama, and was owned by the Pacific Mail Steamship Company, a corporation created under the laws of the State of New York. To the master of this steamship the plaintiff offered his services *456 to pilot the vessel to sea; but his services were refused, and to recover the half-pilotage fees allowed in such cases by the act of 1861, the present action was brought.
At the last term of this court, it was suggested that the constitutionality of the act in question was involved, in the decision of the case; and the court thereupon reserved its consideration until the State of California could be represented. The Attorney-General of the State has accordingly appeared and filed a brief in the case. Since tho action of the court in this respect, the legislature of California has passed a now statute on tho subject of pilots and pilot regulations for the port of San Francisco, re-enacting substantially the provisions of the original act, but at the same time in terms repealing that act. And the first point made by the Attorney-General is, that, by reason of the repeal, the present action cannot be maintained. His position is, that as tho claim to half-pilotage fees was given by the statute, the right to recover the same fell with the repeal of the statute; and that this court must dismiss the writ of error on that ground.
The claim to half-pilotage fees, it is true, was given by the statute, but only in consideration of services tendered. The object of the regulations established by the statute, was to create a body of hardy and skilful seamen, thoroughly acquainted with the harbor, to pilot vessels seeking to enter or depart from the port, and thus give security to life and property exposed to the dangers of a difficult navigation. This object would be in a great degree defeated if the selection of a pilot were left to the option of the master of the vessel, or the exertions of a pilot to reach the vessel in order to tender his services were without any remuneration. The experience of all commercial states has shown the necessity, in order to create and maintain an efficient class of pilots, of providing compensation, not only when the services tendered are accepted by the master of the vessel, but also when they are declined. If the services are accepted, a contract is created between the master or owner of the ves *457 sel and the pilot, the terms of which, it is true, are fixed by the statute; but the transaction is not less a contract on that account. If the services tendered are declined, the half fees allowed are by way of compensation for the exertions and labor made by the pilot, and the expenses and risks incurred by him in placing himself in apposition to render the services, which, in the majority of cases, would be required. The transaction, in this latter case, between the pilot and the master or owners, cannot be strictly termed a contract, but it is a transaction to which the law attaches similar consequences; it is a quasi contract. The absence of assent on the part of the master or owner of the vessel does not change the case. In’ that large class of transactions designated in the law as implied contracts, the assent or convention which is an essential ingredient of an actual contract is often wanting. Thus, if á party obtain the money of another by mistake, it is his duty to refund it, not from any agreement on his part, but from the general obligation to do justice which rests upon all persons. In such case the party makes no promise on the subject; but the law, “ consulting the interests of morality,” implies one; and the liability thus arising is said to be a liability upon an implied contract.* The claim for half-pilotage fees stands upon substantially similar grounds.
“There are many cases,” says Mr. Justice Curtis, speaking for this court, “in which an offer to perform, accompanied by present ability to perform, is deemed by law equivalent to performance. The laws of commercial states and countries have made an offer of pilotage services one of those cases.”†
The claim of the plaintiff’ below for half-pilotage fees, resting upon a transaction regarded by the law as a quasi contract, there is no just ground for the position that it fell with the repeal of the statute under which the transaction was had. When a right has arisen upon a contract, or a transaction in the nature of a contract authorized by statute, *458 and has been so far perfected that nothing remains to be done by the party asserting it, the repeal of the statute does not affect it, or an action for its enforcement. It has become a vested right which stands independent of the statute. And such is the position of the claim of the plaintiff below in the present action: the pilotage services had been tendered by him; his claim to the compensation prescribed by the statute was then perfect, and the liability of the master or owner of the vessel had become fixed.
And it is clear that the legislature did not intend by the repealing clause in the act of 1864, to impair the right to fees, which had arisen under the original act of 1861. The new act re-enacts substantially all the provisions of the original act, relating to pilots and pilot regulations for the harbor of San Francisco. It subjects the.pilots to similar examinations; it requires like qualifications; it prescribes nearly the same fees for similar services; and it allows half-pilotage fees under the same circumstances aslprovidecTTn the original act. It appears to have been passed for the purpose of embracing within its provisions the ports of Mare Island and Benicia, as well as the port of San Francisco ; of creating a Board of Pilot Examiners for the three ports, in place of the Board of Pilot Commissioners for the port of San Francisco alone, and of prohibiting the issue of licenses to any persons who were disloyal to the Government of the United States. The new act took effect simultaneously with the repeal of the first act; its provisions may, therefore, more properly be said to be substituted in the place of, and to continue in force with modifications, the provisions of the original act, rather than to have abrogated and annulled them. The observations of Mr. Chief Justice Shaw, in Wright v. Oakley,* upon the construction of the Revised Statutes of Massachusetts, which in terms repealed the previous legislation of the State, may with propriety be applied to the case at bar.
“In construing the revised statutes and the connected *459 acts of amendment and repeal, it is necessary to observe great caution to avoid giving an. effect to these acts which was never contemplated by the legislature. In terms, the whole body of the statute law was repealed; but these repeals went into operation simultaneously with the revised statutes, which were substituted for them, and were intended to replace them, with such modifications as were intended to be made by that revision. There was no moment in which the repealing act stood in force without being replaced by the corresponding provisions of the revised statutes. In practical operation and effect, therefore, they are rather to be considered as a continuance and modification of old laws than as ah abrogation of those old and the reenactment of new ones.”
On the trial in the court below two grounds- were urged in defence of the action : 1st, the uhconstitutionality of the act of the State of May 20,1861; and, 2d, the repugnancy of its provisions to the act of Congress of August 80, 1852. Similar grounds were urged in this court for the reversal of the judgment.
The unconstitutionality of the act was asserted from its alleged conflict with the 3d clause of the 8th section of the .1st article, which declares that “the Congress shall have power to regulate commerce with foreign nations, and among the several States, and with the Indian tribes.” The power conferred by this clause is without limitation; it extends to all the subjects of commerce, and to all persons engaged in it; it embraces traffic, navigation, and intercourse,' and necessarily, therefore, the whole subject of pilots and pilot-age. But the clause does not, in terms, exclude the exercise of any authority by the States to regulate pilots. On the contrary, the authority of the States to regulate the whole subject, in the absence of legislation on the part of Congress, has been recognized from the earliest period of the Government. On the formation of the Union there were laws in force in the different States bordering on the sea for the regulation of pitots and pilotage; and at its first session, in 1789, Congress passed an act adopting the existing regulations and *460 sucli as might be provided by subsequent legislation of the States. The act reads as follows: “ All pilots in the bays, inlets, rivers, harbors, and ports of the United States, shall continue to be regulated in conformity with the existing laws of the States respectively wherein such pilots may be, or with such laws as the States may respectively hereafter enact for the purpose, until further legislative provision shall be made by Congress.” Iii 1837, another act was passed making it “ lawful for the master or commander of any vessel coining in or going out of any port, situate upon the waters which are the boundary between two States, to employ any pilot diily licensed or authorized by the laws of either of the States.” No other legislation has been had by Congress impairing the right of the States to adopt such system for the regulation of port pilots as they might deem best, unless it be found in the act of August 30,1852.
It is insisted by the plaintiff in error that this act of 1852 is in conflict with the provisions of the act of the State of May, 1861; that in fact it has superseded all State legislation concerning port pilotage, so far as steamers carrying passengers are concerned, and to that extent has modified or repealed the act of 1789.
From a careful examination of the act of 1852 we have arrived at a different conclusion. We do not perceive in its provisions any intention to supersede the State legislation recognized by the act of 1789, or any inconsistency with the local port regulations established by the act of California of 1861. The act of 1852 was intended, as its title indicates, to provide greater security than then existed for the lives of passengers on board of vessels propelled in whole or part by steam. Previous to its passage frequent accidents, occasioning in some instances great loss of life, occurred to steamers, arising from the imperfect construction of the vessel, defective machinery, inadequate protection against fires, the carrying of dangerous articles, or the want of pumps, life-boats, and other means of escape in case of danger. To guard against accidents from these and like sources was the general purpose of the act of 1852. It .therefore contains provi *461 sions relating to fires, pumps, boats, life-preservers, buckets, tLe means of escape from the lower to tlio upper deck, the carrying of gunpowder, camphenc, and .otlier dangerous articles, and their stowage. It also provides for the appointment of two inspectors, one of whom is to possess a practical knowledge of shipbuilding and the uses of steam in navigation, and the other is to possess knowledge of and experience in the duties of an engineer of steam-vessels, and of the construction and use of boilers and machinery and appurtenances connected with them, and the two arc required to make an examination of the hulk of the vessels, to inspect and test the boilers and machinery, and to require licenses to be obtained before dangerous articles can be taken aboard.
The act contains few provisions relating to pilots; indeed, it was not directed to the remedy of any evils of the’ local pilot system. There were no complaints against the port pilots; on the contrary', they were the subjects of just praise for their skill, energy, and efficiency. .The clauses respecting pilots in the act relate, in our judgment, to pilots having charge of steamers on the voyage, and not to port pilots; and the provision that no person shall be employed or ¡serve as a pilot wlio is not licensed by the inspectors has reference to employment and service on the voyage generally, and not to employment and service in . connection with ports and harbors.
Thus the ninth section speaks of a vessel leaving her port with a complement of engineers and pilots, and provides for temporarily supplying the deficiency in case she is deprived of their services on her voyage.* And, again, the same section speaks of pilots as belonging to the vessels on which they are employed, and requires them to assist in the inspection of- the vessels, — language which is entirely inappropriate to local or port pilots, whose employment lasts but a few hours, and wTho have no connection with any vessel except to bring into or take it out of port.†
The term pilots is equally applicable to two classes of per *462 sons, — to those whose employment is to guide vessels in and out of ports, and to those who are intrusted with the management of the helm and the direction of the vessel on her voyage.* To the first class, for the proper performance of their duties, a thorough knowledge of the.port in which they are employed is essential, with its channel, currents, and tides, and its bars, shoals, and rocks, and the various fluctuations and changes to which it is subject. To the second class, knowledge of entirely a different character is necessary. Yet the act in question does not require the inspectors, who are to license pilots under its provisions, to possess any knowledge of the harbors for which, under the theory of-the-plaintiff in error, pilots are to be licensed, or to exactiyany-.such knowledge from the pilots themselves. They are to issue their license to a pilot when satisfied, from “ inquiry as to his character and merits,” that he “possesses the .requisite skill, and is trustworthy and faithful.” The qualifications thus required may be sufficient for the pilot of the steamer on her voyage at sea, but are entirely insufficient for the intricacies of harbor navigation.
Off the argument at the bar much stress was laid by counsel for the plaintiff’ in error upon the language of the first clause of the ninth section, as indicating an intention to supersede State legislation bn the subject of port pilotage. That •section declares “that instead of the existing 'provisions of law for the inspection of steamers and their equipment, and instead of the present system of pilotage of such vessels, and the present mode of employing engineers on board the same,” certain regulations should be observed as prescribed by the act. But in our judgment the section excludes the inference drawn hy counsel. No explanation is given as to the meaning of the term “ system,” as here used; but it is clear that it does not refer to any system established by law. The section supersedes in express terms “ existing provisions of law” for the inspection of steamers and their equipment, but it uses different language when speaking of pilotage. If *463 the section had also been directed against the law recognizing State regulations in respect to port pilotage, the intention of Congress in that respect would undoubtedly have been expressed with equal clearness, and not left to be implied from the use of an' indefinite and ambiguous term.
The act does not purport to establish regulations for port pilotage; and we cannot suppose that in a measure intended to give greater security to life Congress would'have swept away all the safeguards in this respect provided by State legislation without substituting anything in their place. Under the act the ports may be left entirely without resident or local pilots, for it docs not require the appointment of such pilots, -though the necessity for them must have been . obvious. ' Having omitted 'this important requirement, the met omits of course all provisions as to the number of pilots, their, duties, responsibilities, and compensation. These are ^matters of the greatest consequence, are contained in all State regulations, and without them no effective system can ever be established.
Judgment affirmed.

 Argenti v. San Francisco, 16 California 282; Maine on Ancient Law, 344.

 Cooley v. Board of Wardens of Port of Philadelphia, 12 Howard, 312.

 5 Metcalf, 406

 Subdivision 10.

 Subdivision 15.

 Abbott on Shipping, 195; Bouvier’s Law Dictionary, term “Pilots.”