Richard J. DIETZE

v.

Admiral Owen W. SILER, Commandant, U. S. Coast Guard.

Civ. A. No. 75–3501.

United States District Court, E. D. Louisiana.

June 14, 1976.

Alfred M. Farrell, Jr., Terriberry, Carroll, Yancey & Farrell, New Orleans, La., for plaintiff.

Robert L. Boese, Jr., Asst. U. S. Atty., New Orleans, La., for defendant.

## MEMORANDUM OPINION AND ORDER
BOYLE, District Judge:

This action arises under the provision of the Administrative Procedure Act which extends the right of judicial review to one who suffers a "legal wrong" or is "adversely affected or aggrieved" as a result of a final agency action. 5 U.S.C. § 702. Plaintiff Richard Dietze is a river pilot. He seeks to set aside the decision and order of defendant, Admiral Owen W. Siler, Coast Guard Commandant, affirming the ruling of an Administrative Law Judge that plaintiff's federal license endorsement for first-class pilotage be suspended for three months. The parties' stipulation of facts and of the authenticity of certain documents submitted as exhibits enables our decision on the merits of the case, following the presentation of written memoranda and oral argument by counsel. *See* Stipulation, Supplemental Stipulation and Exhibits attached thereto [Record Doc. Nos. 6 and 8].

██ Historically, pilotage on the nation's waterways has been subject to dual governmental control. The individual states reserve the police power to regulate pilots in the bays, inlets, rivers, harbors and ports within their territorial limits, except as otherwise provided by Congress. 46 U.S.C.

§ 211. Hence, the pilots of both American and foreign-flag vessels calling at United States ports are subject to state regulation. At the same time, pursuant to its authority under the Commerce Clause, Congress has provided for federal regulation over pilotage on the waters of the Great Lakes or that which involves "coastwise seagoing vessels not under register and not under way on the high seas." 46 U.S.C. §§ 216a, 364.

Not unlike other pilots wishing to enjoy the full range of operations under this system, plaintiff holds both a federal and state pilot's license. He was commissioned by the State of Louisiana as a River Port Pilot in 1957 and belongs to the Crescent River Port Pilots' Association, a corporate organization of river port pilots licensed and commissioned by the state. As such, he is subject to the various laws of Louisiana concerning Mississippi port pilotage, to the extent these laws are applicable. *See* LSA–R.S. 34:991 *et seq.* In addition, he holds a United States Coast Guard license as a "Master of Steam and Motor Vessels," issued in 1971 and endorsed for first-class pilotage for certain waterways of the Lower Mississippi. *See* Exh. No. 1, attached to Stipulation [Record Doc. No. 6].

On September 24, 1974, Dietze was piloting a British flag vessel, the M/S ANCO PRINCESS, on the Mississippi River inbound to New Orleans, when the vessel collided with a barge in the tow of the M/V LIBBY BLACK. A Coast Guard investigation of the incident ensued, and, charging plaintiff with certain acts of negligence in his pilotage of the PRINCESS, the agency then instituted a suspension/revocation proceeding against his federal license. At the hearing before an Administrative Law Judge, plaintiff's objection to the Coast Guard's exercise of jurisdiction in the matter was overruled. The judge concluded that jurisdiction arose under two statutory provisions, 46 U.S.C. § 214 and 46 U.S.C. § 239,[1] and proceeded to the merits, ordering plaintiff's federal license suspended for

---

1. Section 214 provides as follows:
    Whenever any person claiming to be a skillful pilot of steam vessels offers himself for a

license, the Coast Guard shall make diligent inquiry as to his character and merits, and if satisfied, from personal examination of the ap-

three months based on the finding that the charge of negligence was established.

In accordance with federal regulations, plaintiff appealed the decision to the Commandant of the Coast Guard, Admiral Owen W. Siler. *See* 46 C.F.R. § 5.30–1. Addressing the jurisdictional question, the latter noted that section 239 authorizes suspension/revocation proceedings by the Coast Guard for an officer's acts of incompetency or negligence while "acting under authority of his license . . . ." *See* 46 U.S.C. § 239(d). He concluded that on September 14, 1974, plaintiff was not acting under the authority of his federal license and that jurisdiction under 239 was lacking. *See* Commandant's Decision at p. 8, Exh. No. 11 attached to Stipulation [Record Doc. No. 6]. At the same time, the Commandant recognized section 214 as a separate and independent basis of jurisdiction, agreed that negligence on the part of Dietze was proven and affirmed the order of suspension.[2] This lawsuit followed.

The parties have stipulated that the question of plaintiff's negligence is not contested herein, and that, likewise, the existence or non-existence of jurisdiction under sec-

---

plicant, with the proof that he offers that he possesses the requisite knowledge and skill, and is trustworthy and faithful, it shall grant him a license for the term of five years to pilot any such vessel within the limits prescribed in the license; but such license shall be suspended or revoked upon satisfactory evidence of negligence, unskillfulness, inattention to the duties of his station, or intemperance, or the willful violation of any provision of title 52 of the Revised Statutes "[now Title 46 of the U.S. Code]."

In pertinent part, section 239 provides:

(b) The Commandant of the Coast Guard shall establish rules and regulations for the investigation of marine casualties and accidents not involving loss of life, any act in violation of any of the provisions of title 52 of the Revised Statutes or of any of the regulations issued thereunder, and all cases of acts of incompetency or misconduct committed by any licensed officer or holder of a certificate of service while acting under the authority of his license or certificate of service, whether or not any of such acts are committed in connection with any marine casualty or accident. . . .

(d) All acts in violation of any of the provisions of title 52 of the Revised Statutes or of any of the regulations issued thereunder, whether or not committed in connection with any marine casualty or accident, and all acts of incompetency or misconduct, whether or not committed in connection with any marine casualty or accident, committed by any licensed officer acting under authority of his license . . . and all marine casualties and accidents and the attendant circumstances shall be immediately investigated as provided in subsections (a) and (b) of this section. The investigation shall determine, as far as possible, the cause of any such casualty or accident, the persons responsible therefor, and whether or not the United States Government employees charged with the inspection of the vessel or the vessels involved and with the examination and licensing of the officers thereof have properly performed their duties in connection with such inspection, examination and licensing. In all investigations conducted under the authority of this section, any owner, licensed officer, or any holder of a certificate of service, or any other person whose conduct is under investigation, or any other party in interest, shall be allowed to be represented by counsel, to cross-examine witnesses, and to call witnesses in his own behalf, and a full and complete record of the facts and circumstances shall be submitted to the Commandant of the Coast Guard.

(g) In any investigation of acts of incompetency or misconduct or of any act in violation of the provisions of title 52 of the Revised Statutes or of any of the regulations issued thereunder, committed by any licensed officer or any holder of a certificate of service, the person whose conduct is under investigation shall be given reasonable notice of the time, place, and subject of such investigation and an opportunity to be heard in his own defense. The whole record of the testimony received by such investigation and the findings and recommendations shall be forwarded to the Commandant of the Coast Guard, and if that officer shall find that such licensed officer or holder of certificate of service is incompetent or has been guilty of misbehavior, negligence, or unskillfulness, or has endangered life, or has willfully violated any of the provisions of title 52 of the Revised Statutes or any of the regulations issued thereunder, he shall, in a written order reciting said findings, suspend or revoke the license or certificate of service of such officer or holder of such certificate. . . .

2. In a supplemental decision and order, the Commandant noted that the Administrative Law Judge improperly suspended plaintiff's master's license instead of just the pilotage endorsement appearing thereon. Accordingly, the order of suspension was affirmed as modified to affect the endorsement only. *See* Supplemental Decision and Order, Exh. No. 12, attached to Stipulation [Record Doc. No. 6].

tion 239 is not an issue before this court. *See* Stipulation Nos. 21 and 22 [Record Doc. No. 6]. Hence, we concern ourselves with a single, rather narrow inquiry: whether 46 U.S.C. § 214, standing alone, serves as a sufficient basis of jurisdiction in Coast Guard suspension/revocation proceedings against a pilot's federal license.[3] Defendant contends that it does, and that proceedings such as the one *sub judice* which are not covered under section 239 *must* be brought under section 214. It is plaintiff's position, on the other hand, that section 239 is the controlling provision in Coast Guard proceedings against federal licenses, and that section 214 does not and cannot confer jurisdiction to revoke or suspend the federal license of a pilot for actions pursuant to the authority of his state license.

■ Our objective in such matters of statutory construction is to ascertain and give effect to the aim of Congress. Perhaps the best evidence thereof is the actual language which the legislature employs to express its wishes. *See United States v. American Trucking Ass'n,* 310 U.S. 534, 543, 60 S.Ct. 1059, 1063, 84 L.Ed. 1345 (1940). In this case, language conferring authority upon the Coast Guard to revoke or suspend a pilot's license appears not only in section 214, but also in section 239(g), the latter applying as it does to "any licensed officer." Moreover, language parallel to that in 214 is used in sections 226, 228 and 229 of Title 46, which extend to the Coast Guard the power to grant as well as to suspend or revoke the licenses of captains, mates and engineers, respectively.[4] We do not con-

**3.** The scope of review under the Administrative Procedure Act extends to the setting aside of agency action found to be "in excess of statutory jurisdiction. . . ." 5 U.S.C. § 706(2)(C).

**4.** These sections provide as follows:

§ 226. *Licenses of captains*

Whenever any person applies to be licensed as master of any steam vessel, or of a sail vessel of over seven hundred tons, the Coast Guard shall make diligent inquiry as to his character. and shall carefully examine the applicant as well as the proofs which he presents in support of his claim, and if it is satisfied that his capacity, experience, habits of life, and character are such as warrant the belief that he can safely be intrusted with the duties and responsibilities of the station for which he makes application, it shall grant him a license authorizing him to discharge such duties on any such vessel for the term of five years; but such license shall be suspended or revoked upon satisfactory proof of bad conduct, intemperate habits, incapacity, inattention to his duties, or the willful violation of any provision of title 52 of the Revised Statutes applicable to him.

§ 228. *Licenses of mates*

Whenever any person applies for authority to be employed as chief mate of ocean or coastwise steam vessels or of sail vessels of over seven hundred tons, or as second or third mate of ocean or coastwise steam vessels, who shall have charge of a watch, or whenever any person applies for authority to be employed as mate of river steamers, the Coast Guard shall require satisfactory evidence of the knowledge, experience, and skill of the applicant in lading cargo and in handling and stowage of freight, and if for license as chief mate on ocean or

coastwise steamers, or of sail vessels of over seven hundred tons, or as second or third mate of ocean or coastwise steamers, who shall have charge of a watch, shall also examine him as to his knowledge and ability in navigation and managing such vessels and all other duties pertaining to his station, and if satisfied of his qualifications and good character it shall grant him a license authorizing him to perform such duties for the term of five years upon the waters upon which he is found qualified to act; but such license shall be suspended or revoked upon satisfactory proof of bad conduct, intemperate habits, unskillfulness, or want of knowledge of the duties of his station or the willful violation of any provision of title 52 of the Revised Statutes.

§ 229. *Licenses of engineers*

Whenever any person applies for authority to perform the duties of engineer of any steam vessel, the Coast Guard shall examine the applicant as to his knowledge of steam machinery, and his experience as an engineer, and also the proofs which he produces in support of his claim; and if, upon full consideration, it is satisfied that his character, habits of life, knowledge, and experience in the duties of an engineer are all such as to authorize the belief that he is a suitable and safe person to be intrusted with the powers and duties of such a station, it shall grant him a license, authorizing him to be employed in such duties for the term of five years, in which it shall assign him to the appropriate class of engineers; but such license shall be suspended or revoked upon satisfactory proof of negligence, unskillfulness, intemperance, or the willful violation of any provision of title 52 of the Revised Statutes. Whenever complaint is made against any engi-

strue the explicit grant of authority in section 214 in isolation, therefore, but rather with contextual reference to these grants of the same or related authority as expressed elsewhere in the Act. *See Richards v. United States*, 369 U.S. 1, 11, 82 S.Ct. 585, 591–92, 7 L.Ed.2d 492 (1962). Particularly in regard to section 239, since it treats the same subject of suspension/revocation in a different manner, we consider it *in pari materia* with the individual license provisions in sections 214, 226, 228 and 229.[5] To the extent that conflicting inferences arise from such an analysis, our task is to harmonize the use of suspension/revocation language in section 214 (and its companion sections) with that in 239(g). It is axiomatic that, if possible, all parts of an act are to be given effect. *See Administrator, FAA v. Robertson*, 422 U.S. 255, 95 S.Ct. 2140, 2145, 45 L.Ed.2d 164 (1975).

The pattern of section 214 is repeated in each of sections 226, 228 and 229. The authority to award a license is coupled with the proviso that the license is subject to being suspended or revoked; and, in each case, the qualifications stated as necessary in order to be granted a license as well as the grounds required to warrant suspension or revocation vary according to the officer in question.[6] Section 239, on the other hand, primarily addresses itself to the Coast Guard's authority incident to its investigation of marine casualties. The agency is directed by subsection (d) to "immediately" investigate three defined categories of cases: "all marine casualties and accidents," all acts violative of Title 46 or the regulations pursuant thereto, whether or not involving a marine casualty or accident, and, finally, "all acts of incompetency or misconduct, whether or not committed in connection with any marine casualty or accident, committed by any licensed officer acting under the authority of his license . . . ." In the case of any investigations, the scope thereof is generally delineated and certain procedural safeguards insured. Subsection (g) then refers to those investigations prompted by acts of incompetency or misconduct by a licensed officer, and, after guaranteeing the officer's right to a notice and hearing, empowers the suspension or revocation of his license—by written order—if proven there was incompetence, misbehavior, negligence, unskillfulness, the endangering of life, or a willful violation of the statute.

A reading of these provisions together and as the separate components of a single legislative scheme leads us to reject the conclusion that section 214 stands as a self-contained grant of jurisdictional authority to the Coast Guard.

To begin with, it is one of the dubious corollaries of defendant's position that not only section 214 but also sections 226, 228 and 229 constitute independent bases of jurisdiction for revocation/suspension proceedings.[7] Yet, the language of 239, albeit more specific in the sense of having greater detail, also is purposefully broader in its

---

neer holding a license authorizing him to take charge of the boilers and machinery of any steamer, that he has, through negligence or want of skill, permitted the boilers in his charge to burn or otherwise become in bad condition, or that he has not kept his engine and machinery in good working order, it shall be the duty of the Coast Guard, upon satisfactory proof of such negligence or want of skill, to revoke the license of such engineer and assign him to a lower grade or class of engineers, if it finds him fitted therefor.

5. As noted in our discussion of the legislative history of Title 46, *infra*, sections 214 and 239 originally were consecutive sections of the same act. They in particular must be construed together.

6. Thus, for example, although a "willful violation" of the statute is ground for the suspension or revocation of the license of any one of the four officers, only in the case of a pilot or an engineer does "negligence" serve as such, and "bad conduct" only in the case of a captain or a mate. *Compare* 46 U.S.C. §§ 214 and 229 *with* 46 U.S.C. §§ 226 and 228.

7. *See* Defendant's Memorandum at p. 6 [Record Doc. No. 7].

It would be both illogical and inconsistent for defendant to argue otherwise. Surely, if Congress intended section 214 as a grant of jurisdictional authority to proceed against the licenses of pilots, the provisions in 226, 228 and 229 were enacted with similar intent as to captains, mates and engineers.

reach than that of the individual licensing sections. The repeated reference in 239(b), (d) and (g) to "any licensed officer" demonstrates this section's applicability to the Coast Guard's exercise of both its investigatory and suspension/revocation authority vis-a-vis pilots, captains, mates and engineers. Indeed, the stated grounds for suspension or revocation in 239(g) appear sufficiently broad to incorporate all of the varying grounds set forth in sections 214, 226, 228 and 229. Reasonable as it is to regard jurisdictional authority as the outgrowth of this single, universally applicable section of Title 46, it is unreasonable to believe that Congress sought to establish four separate bases of jurisdiction in addition to a single, largely overlapping fifth.

■ Furthermore, we regard the more detailed prelude to the suspension/revocation language in 239 as highly significant in terms of the functions which sections 214 and 239 apparently were meant by Congress to serve. The words of 214 evidence legislative intent that the licensing authority of the Coast Guard would entail the power to give as well as the power to take away. The grant of the latter logically and necessarily relates back to and complements the grant of the former that precedes it, just as the requirement that certain conditions be met in order to acquire a pilot's license implies the existence of conditions necessary in order to retain it. Once a license is acquired, however, the most rudimentary notions of due process require that certain limitations attend the exercise of agency authority aimed at depriving an individual of the property right to engage in his licensed occupation. Given the silence of 214 in this regard—save for the statement of grounds for suspension/revocation—one logically refers to the Coast Guard's authority to proceed pursuant to its investigatory mandate, and looks beyond section 214 (and sections 226, 228 and 229) to section 239 as a necessary basis of that authority. Since the latter section alone

specifically directs that the agency shall take action against an individual's license within the accepted limits of due process, the revocation/suspension grant in 214 should be viewed as anticipatory and incapable *per se* of vesting the agency with authority to proceed. In effect, the language of section 239 establishes a jurisdictional blueprint without which the grant of suspension/revocation authority in 214 must remain inchoate.

Our conclusion based on the language of 214 and 239 that resort cannot be had to the former as a self-sufficient jurisdictional basis in Coast Guard license proceedings, is one which is fortified by the legislative history of Title 46. In 1852, Congress enacted sweeping amendments to the existing law regulating pilotage, and supplanted the states' individual control over the piloting and engineering of steam vessels with a system of federal inspection and federally qualified pilots and engineers. *See* Act of August 30, 1852, Exh. No. 5 attached to Stipulation [Record Doc. No. 6].[8] In these amendments first appears terminology granting federal authority (to a federal board of inspectors) to license pilots. Sections 214 and 239 are foreshadowed in subsections 9 and 13, respectively, of section 9 of the 1852 Act. The former subsection, however, not only directs the awarding of a license upon proof of requisite skill and provides for revocation upon proof of negligence, unskillfulness, etc., but also proceeds to set forth procedural limitations, allowing an appeal to and examination by a supervising inspector in cases of revocation or the refusal to license. In subsection 13, the authority of the board to conduct proceedings is described, including its power to subpoena and examine witnesses, following which the board is authorized to "immediately suspend or revoke" licenses based on a showing of incompetence, negligence, misconduct, or the endangering of life.

By the Act of February 28, 1871, all prior legislation concerning federal pilotage regu-

---

8. The effect of this legislation upon state systems of regulation was mitigated to some extent by a later Supreme Court ruling that the legislation was not intended to cover *port* pilots. *See Steamship Company v. Joliffe*, 69 U.S. (2 Wall.) 450, 460–63, 17 L.Ed. 805 (1864).

lation was repealed or recodified and a new comprehensive system of federal regulation enacted. *See* Act of February 28, 1871, Exh. No. 6, *id.* Therein, the predecessors of sections 214 and 239 became consecutive provisions of the statute, sections 18 and 19 respectively. The first of these, like section 9, subsection 9 of the 1852 law before it, announces the authority of individual federal inspectors to license pilots, and again provides that any license is subject to revocation or suspension—on the same grounds now stated in section 214. Significantly, however, section 18 makes no further provisions regarding how actions against licenses should proceed. Instead, in section 19, one finds that local *boards* of inspectors are authorized to investigate certain incidents,[9] to conduct hearings and to take suspension/revocation action pursuant thereto. Between 1871 and the present time, only minor or nongermaine changes in the Act have occurred.

The foregoing makes clear that in 1852 and again in 1871, Congress employed language authorizing the revocation or suspension of federal pilot licenses in the same two distinct contexts now represented by 214 and 239. The one relates to an administrative responsibility to diligently inquire into applications and grant licenses; the other pertains to the far different responsibility of investigating incidents with an eye toward possibly divesting an individual of his license. At both the 1852 and 1871 stages of the development of Title 46, this functional distinction is made by Congress in assigning to the Coast Guard the authority to grant or revoke pilot licenses. Indeed, the removal of procedural phraseology from former subsection 9 of section 9 of the 1852 Act—which is evidenced in the consecutive arrangements of sections 18 and 19 in the Act of 1871—indicates this intentional distinction quite clearly enough. Moreover, introduction of section 19 in the latter Act with the phrase "be it further enacted," relates the implementing phraseology of this section back to the general grant of authority in section 18 (now section 214). Had Congress intended to grant the Coast Guard jurisdictional authority solely on the basis of the earlier-placed provisions in any of the statutes—1852, 1871 or the current version—its labor to separately allow for authority to investigate, conduct proceedings and revoke or suspend licenses within the proper procedural limits of due process, makes precious little sense.

Against the backdrop of this analysis, the position of defendant becomes untenable. If, as the Government contends, sections 214 and 239 are alternative grounds for jurisdiction, then section 239 must lose much—if not all—of its vitality as a basis of jurisdiction. The election to proceed under the less-restrictively stated authority of 214 might well be made in every instance, there appearing nothing in the revocation/suspension language thereof to limit its applicability to cases not capable of being brought under 239, i.e., cases in which one is acting under the authority of his state license. This would render certain jurisdictional language of 239—that limiting the investigation by the "while acting under. . . ." phrase in subsection (d) —mere surplusage, a result which Congress clearly cannot have intended. *See United States v. Wong Kim Bo*, 472 F.2d 720, 722 (5 Cir. 1972). More importantly, the due process safeguards of section 239 are indispensable components in any exercise of the Coast Guard's revocation/suspension authority. Surely, defendant cannot be heard to seek the triggering of these safeguards for constitutional purposes, while at the same time "opting out" of the jurisdictional limitations of the same section.

■ The result we reach on the basis of a linguistic and historical analysis is not intended to derogate the principle that great weight should be given the construction of a law that is adopted by the agency charged with the law's enforcement. *See Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965). Like any agency, however, the Coast Guard is a creature of stat-

---

**9.** Here, for the first time, Congress introduces the limiting phrase "while acting under the authority of his license" in defining the acts of a licensed officer subject to investigation.

ute, and its exercise of interpretive authority necessarily is subject to limits imposed by what this court perceives to be the intent of Congress. Additionally, the weight we attach to an administrative interpretation depends

> upon the thoroughness evident in its consideration, the validity of its reasoning, *its consistency with earlier and later pronouncements*, and all those factors which give it power to persuade, if lacking power to control.

*Skidmore v. Swift & Co.*, 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed.2d 124 (1944) [emphasis added].

The fact is that for the years preceding 1974, the Coast Guard was satisfied to proceed against federal licenses under the authority of section 239, referring to the states those cases where pilots were acting under their state licenses. Moreover, still in effect is an agency regulation which states that

> [t]he mandatory provisions in Title 46, U.S.Code, section 239, govern suspension and revocation proceedings and are the basic authority therefor. . . .

46 C.F.R. § 5.01–1(b). It is only with the relatively recent dissatisfaction of the agency with the states' discharge of their regulatory responsibility that the Commandant has directed that suspension/revocation proceedings be brought under section 214.[10] Defendant's current position, then, appears to be less an outgrowth of consistent statutory interpretation than a symptom of deterioration in the spirit of federal-state cooperation in this area.

In 1789, Congress for the first time addressed itself to the regulation of pilots, directing—in a law now codified as 46 U.S.C. § 211—that

> [u]ntil further provision is made by Congress, all pilots in the bays, inlets, rivers, harbors, and ports of the United States shall continue to be regulated in conformity with the existing laws of the States . . . ..

This recognized legislatively the state system of pilot regulation which had existed since the nation's founding, and, as the Supreme Court later would note on the occasion of finding the Act consistent with federal responsibility under the Commerce Clause, such a rule

> manifests the understanding of Congress, at the outset of the government, that the nature of this subject is not such as to require its exclusive legislation. The practice of the states, and of the national government, has been in conformity with this declaration, from the origin of the national government to this time; and the nature of the subject . . . is such as to leave no doubt of the superior fitness and propriety, not to say the absolute necessity, of different systems of regulation, drawn from local knowledge and experience, and conformed to local wants.

*Cooley v. The Board of Wardens of the Port of Philadelphia*, 53 U.S. (12 How.) 299, 319, 13 L.Ed. 996 (1851). Even at the point in the nation's history when safety aboard steam vessels and greater pilot regulation had become national concerns leading to the enactment of a comprehensive federal system, this regard for the territorial prerogatives of the individual states was in evidence. In the Act of 1871, federal control first was asserted over pilotage on the Great Lakes and aboard coastwise seagoing vessels. *See* Act of February 28, 1871, § 51, now codified as 46 U.S.C. § 364. Yet, the very same section of the Act, section 51, further provided that nothing in it was to be construed as annulling or affecting state requirements that vessels leaving or entering their ports carry pilots with state licenses. This provision now appears as part of 46 U.S.C. § 215.

In our view, the interpretation of Title 46 we adopt herein is wholly consistent with this historical attempt of Congress to preserve the integrity of state regulation even while promoting public safety. There can

---

**10.** This change in policy is reflected by the Commandant's issuance of a letter message on September 18, 1974, to all Coast Guard District Commanders. *See* Stipulation No. 16 and Exh. No. 9 [Record Doc. No. 6].

be no doubt that the Coast Guard retains full authority under sections 214 and 239(g) to suspend or revoke the federal licenses of pilots. Whatever jurisdictional limitations upon the exercise of that authority exist, are imposed by the express mandate of section 239. Thus retained is the traditional right of each state to enforce the standards of state pilotage laws as to acts under state licenses, free of the possibility that the same acts will be subject to federal investigation and the same pilots subject to sanction under federal law.[11] We have struck what we regard as the balance of these interests intended by Congress. To the extent certain events have transpired which lead the Coast Guard to now question the fairness of this balance, its remedy is perhaps more legislative than judicial in nature.

**11.** This broad state interest was recognized by the Ninth Circuit in a decision which rejected the Coast Guard's attempt to define the "while acting under. . . ." phrase of section 239(b) to include a pilot's action under his state license where a federal license was a condition of the pilot's state employment. Acknowledging that the state may avoid the embrace of such an interpretation simply by not making a pilot's federal license a condition of state employment, the court observed:

Nonetheless . . . the state . . . still might not wish to see its own pilots investigated and reprimanded for alleged misconduct while serving as compulsory pilots pursuant to state law.

*Soriano v. United States,* 494 F.2d 681, 684 (9 Cir. 1974).

This same state interest in the integrity of its individual regulatory system we seek to guard by construing 239 as a necessary jurisdictional adjunct in Coast Guard actions against federal licenses.