[No. A052103. First Dist., Div. Two. June 3, 1992.]

DONALD L. HOCHSTETLER, Plaintiff and Appellant, v.
BOARD OF PILOT COMMISSIONERS FOR THE BAYS OF SAN
FRANCISCO, SAN PABLO AND SUISUN, Defendant and Respondent.

[Opinion certified for partial publication.*]

*Pursuant to California Rules of Court, rule 976.1(a), this opinion is certified for publication with the exception of section II.B.

COUNSEL

Meadows, Smith, Lenker, Sterling & Davis, Paul Gary Sterling and Leopoldo J. Chanco for Plaintiff and Appellant.

Finan, White & Paetzold, Raymond M. Paetzold and Holly A. Harris for Defendant and Respondent.

## OPINION

**PETERSON, J.**—In this case of apparent first impression, we hold that state authorities can suspend the state pilot license of a ship's pilot, even though the grounds for his suspension occurred when he was acting under the authority of his federal pilot license—at the time he crashed a loaded oil tanker into a terminal. Action by state authorities against the pilot's state license does not offend principles of federal-state comity, where the state does not purport to suspend or otherwise impair the pilot's federal license.

### I. FACTS AND PROCEDURAL HISTORY

#### A. *Appellant Crashes an Oil Tanker Into a Wharf*

On the morning of April 14, 1989, appellant went aboard the supertanker Overseas Juneau, an oil tanker en route from Valdez, Alaska loaded with 400,000 barrels of oil, in order to pilot the ship into moorage at Chevron Oil Company's Richmond Long Wharf in San Francisco Bay. The weather was clear, visibility was unlimited, and the tidal current was ebbing at less than one knot.

 ██ █ Appellant gave a number of orders while piloting the ship, which ultimately resulted in an "allision,"[1] in which the ship crashed head on into the wharf. This constituted grounds for action against his pilot license. (See *Wardell v. DOT, Nat. Transp. Safety Bd.*, supra, 884 F.2d at p. 511 [upholding suspension of the federal license of a pilot who caused a similar allision between his vessel and a dock].)

Fortunately, the portion of the wharf appellant struck and destroyed was a relatively soft portion, and the hull of the Overseas Juneau did not rupture. Testimony by appellant and others and photographs of the crash scene reveal that, if appellant had crashed into the wharf at a point 50 feet away from the collision point, he would have struck either the concrete mooring platform or the oil transfer platform; and as a witness opined, " 'it'd have been a total disaster.' "

#### B. *The Board Takes Action Against Appellant's State License*

Respondent Board of Pilot Commissioners for the Bays of San Francisco, San Pablo and Suisun (Board) is a state agency with responsibility for the regulation of pilots licensed by the state. (Harb. & Nav. Code, § 1150.) It is

---

[1]The term "allision" is used in maritime accident cases to describe an accident involving a moving vessel, on the one hand, and a stationary object or vessel on the other. (See *Wardell v. DOT, Nat. Transp. Safety Bd.* (9th Cir. 1989) 884 F.2d 510, 511 and fn. 1.)

composed of seven members appointed by the Governor with the consent of the Senate. (*Ibid.*) Two members must be pilots licensed by the state; two must represent shipowners (one member representing the tanker industry, the other the dry cargo industry); and three must be members of the public with no ties to pilotage or the shipping industry. (*Ibid.*) "A quorum of the board members consists of four members. All actions of the board shall require the vote of four members, a quorum being present." (*Ibid.*)

In the past, when a piloting accident has occurred, one of the Board's members has been assigned to act as an "Executive Member" to investigate the circumstances and, if the facts warrant, refer the matter to the full Board. (Cal. Code Regs., tit. 7, § 210.) In the present case, Commissioner Simenstad, a public member of the Board, investigated the matter and brought a formal accusation before the full Board, charging appellant with negligence in causing the crash. The charging language of the accusation states: "The allision of the S/T OVERSEAS JUNEAU with the Richmond Long Wharf was proximately caused by the negligent, ignorant, or willful acts of Captain HOCHSTETLER in that he did not have adequate control of the vessel, failed to make fast the ship-assist tugs sufficiently in advance of the approach to the wharf, and approached the wharf at excessive speed." The accusation warned appellant that "the BOARD will, after hearing, or without hearing if you have waived a hearing, determine whether revocation or suspension of your [state-issued] Pilot License, or other appropriate penalty, should be imposed."

Appellant contested the Board's jurisdiction, contending it could not discipline him for the crash since he had been acting under the authority of his federal license at the time—the Overseas Juneau being an "enroll[ed]" vessel engaged in interstate commerce in the "coastwise trade" under federal law. (See 46 U.S.C. §§ 12101(b)(2), 12106.) The Board rejected this jurisdictional challenge, ruling in accordance with an opinion by an administrative law judge that the Board retained jurisdiction over the matter.

The issue then proceeded to the contested hearing before the Board. Commissioner Simenstad, having signed the accusation, did not participate as a voting member at the hearing by the full Board. Five other members of the Board acted initially in the matter; Commissioner Adam, an industry member recently appointed by the Governor, also attended most of the hearings. After three days of hearings, the five members voted three to two to uphold the charge of negligence. However, when the Board recognized that this action requires four votes, per Harbors and Navigation Code section 1150, the Board announced it was unable to reach a final decision.

At the next meeting of the Board, Commissioner Adam joined the other five members in voting, having reviewed the transcripts of any hearings he

had not attended in person. The Board then upheld its own jurisdiction to act, and the accusation of negligence, on a four-to-two vote.

The Board suspended appellant's state pilot license for 60 days, with the penalty stayed and appellant placed on probation for 6 months; as a condition of probation, appellant's license was suspended for 30 days, and he was required to successfully complete a pilot training program at his own expense.

### C. *Appellant Goes to Court*

The matter then proceeded to litigation in the courts. Appellant filed a petition for a writ of mandate in the trial court, seeking to overturn the Board's rulings. After hearing the matter, the trial court denied the petition and entered judgment for the Board. Appellant brought a timely appeal.[2]

## II. DISCUSSION

We affirm the trial court's ruling denying the petition for a writ of mandate. The Board's authority under state law to suspend appellant's state pilot license is not impaired by federal laws relating to federal jurisdiction over federal pilot licenses. The Board has not purported to suspend or take action against appellant's federal license. Further, the proceedings before the Board were proper, and did not violate appellant's rights.

### A. *States Retain Authority Over State-issued Pilot Licenses*

"To be sure, state [regulation of] pilotage is not a body of law familiar to most legal practitioners, much less one at the forefront of public attention. Yet it is not a particularly difficult body of law." (*Jackson* v. *Marine Exploration Co., Inc.* (5th Cir. 1978) 583 F.2d 1336, 1350.) Nor is this body of law abundant in direct precedents, despite its importance in antiquity and in the present era. ■■ Here, for instance, we must decide a matter which seemingly lacks direct precedent: Whether the state's power to suspend state licenses for pilots is preempted by federal law, where the pilot was using a federal license at the time of a misadventure. We conclude the state retains the authority to suspend a license which the state itself has issued and is responsible for overseeing.

---

[2]Appellant had also filed an action in federal district court (N.D.Cal. No. C-892663 WWS) seeking an injunction restraining the Board from acting in this matter. The record does not reveal the result, if any, in the federal action.

1. *The History of the States' Plenary Role in Regulating State Licenses of Pilots*

In *Ex parte McNiel* (1871) 80 U.S. [13 Wall.] 236, 239 [20 L.Ed. 624, 625], Mr. Justice Swayne traced the regulation of pilotage by the states to such recondite sources as Ulpian, the Laws of Oleron, the Hanseatic Ordinances, and an English law (3 George I, ch. 13) requiring that vessels take on licensed pilots as they approach inshore waters. Of more immediate relevance, however, is the fact that, by the time of the Revolution during the reign of George III, the individual states had already begun the regulation and licensing of pilots familiar with the hazards of local inshore waters, and were requiring shipborne commerce to use local pilots. (See Comment, *Disciplining Maritime Pilots: A Review of State and Federal Pilotage Regulation* (1984) 58 Tul.L.Rev. 1460, 1470-1471, hereafter Comment.)

The First Congress—called into session soon after the Constitution of 1789 took effect—undoubtedly exercised plenary power over all aspects of interstate commerce, including pilotage, but quickly retroceded to the states the power to regulate pilots under state laws " 'until further legislative provision should be made by Congress.' " (*Ex Parte McNiel, supra*, 80 U.S. at p. 241 [20 L.Ed. at p. 626], quoting the Act of Aug. 7, 1789, 1 Stat. 53, ch. 9, § 4, p. 54.) From that time to the present, the states have exercised (and shared with the federal government, to varying degrees) the function of licensing and regulating ships' pilots. (See *Cooley* v. *Board of Wardens of Port of Philadelphia* (1851) 53 U.S. [12 How.] 299, 314-315 [13 L.Ed. 996, 1002-1003].)

This state power over pilots has been repeatedly reaffirmed by the federal Supreme Court, sometimes in cases arising out of the operations of the predecessors to respondent Board. For instance, the landmark case of *Steamship Company* v. *Joliffe* (1864) 69 U.S. [2 Wall.] 450, 455 [17 L.Ed. 805, 806] upheld an 1861 statute passed by the California Legislature, establishing a board of commissioners to license and regulate pilots on San Francisco Bay—a predecessor to the current statutory scheme. This state regulation and licensure of pilots was not preempted by federal law, because it was not in conflict with any specific provision of that federal law: "If the [federal law] had also been directed against the law recognizing State regulations in respect to port pilotage, the intention of Congress in that respect would undoubtedly have been expressed with equal clearness, and not left to be implied from the use of an indefinite and ambiguous term." (*Id.* at pp. 462-463 [17 L.Ed. at pp. 808-809].)

In 1871, Congress passed legislation which explicitly restated the states' pervasive role in the regulation of pilots, with certain carefully drawn

exceptions in which the federal role is supreme. (See Comment, *supra*, 58 Tul.L.Rev. at pp. 1478-1479.) The 1871 federal statutory scheme has remained largely intact to the present day; as now codified, it establishes a dichotomy in pilot licensures. There is a requirement that *enrolled* vessels— those travelling between United States ports, coastwise, or in inland waters —have federally licensed pilots. (See former 46 U.S.C. § 364, recodified as present 46 U.S.C. § 8502.) As to *registered* vessels sailing between the United States and foreign ports, the states retain the power to require that the pilots of these vessels have a valid state license. (See 46 U.S.C. § 8501; *Jackson* v. *Marine Exploration Co., Inc., supra,* 583 F.2d at pp. 1340-1341.) Paradoxically, then, the federal government (acting through the Coast Guard) maintains some control only over the licenses of pilots engaged in commerce internal to the United States but between the states thereof; the states retain plenary power over the license of pilots engaged in the seemingly much more important trade with foreign nations.

It is undisputed that appellant was acting, at the time of the crash, as the pilot of an enrolled vessel traveling between United States ports; and he, thus, was acting under the authority of his federal license. However, no action by the state has sought to suspend or revoke that *federal* license. Rather, the state sought here to suspend appellant's *state* license, which he would use on registered vessels subject to state regulation. This is an area of regulation of pilotage specifically reserved to the states, even though the state action here was generated by appellant's misconduct which occurred in the docking of an enrolled vessel he was then piloting under the authority of his federal license. (See *Steamship Company* v. *Joliffe, supra,* 69 U.S. at pp. 459, 462-463 [17 L.Ed. at pp. 807-808, 808-809].)

### 2. *The Soriano Case*

While neither the parties nor our own research efforts have disclosed any recent cases explicitly holding on this point, two decisions by federal courts of appeals address the subject indirectly. The lead case of *Soriano* v. *United States* (9th Cir. 1974) 494 F.2d 681, when carefully analyzed, supports our conclusion that the state retains jurisdiction to suspend or revoke the pilot license it issued to a licensee, whose conduct precipitating such action occurs when piloting a ship under the authority of his federal pilot license.

*Soriano* dealt with a situation in some ways contrapositive to this one: The federal government, acting through the Coast Guard, sought to suspend a pilot's federal license as a result of misconduct allegedly occurring while the pilot was operating under his state license. The Ninth Circuit, per Judge Goodwin, reversed the Coast Guard's action, since the Coast Guard was not

authorized by federal statute to infringe upon the area of unquestioned state preeminence over a state license. (*Soriano* v. *United States, supra,* 494 F.2d at p. 684.)

In *Soriano*, the State of Washington required applicants for a state license to hold a federal pilot license. (494 F.2d at p. 682.) Thus, if the Commandant of the Coast Guard revoked the federal license, the state license would also be affected. Federal regulations allowed the Coast Guard to take action against any person " 'while acting under the authority of' " any federal license which a person held " 'as a condition of employment.' " (*Id.* at pp. 682-683.) The Coast Guard claimed this regulation gave it the power to act against Soriano, since even though he had been acting " 'under the authority of' " his state license, his federal license was a condition of employment under his state license; thus, revocation of the federal license for acts committed while piloting under a Washington State license would preclude further employment under that state license.

However, the Ninth Circuit held that the Coast Guard's action was ultra vires. *For the purposes of the federal regulation,* the Coast Guard claimed Soriano was acting under authority of his federal license (a condition in Washington to acquisition of a state license) when in fact he was acting under his state license at the time of the incident triggering action by the Coast Guard against the federal license. (*Soriano* v. *United States, supra,* 494 F.2d at p. 683-684.) The Coast Guard's assertion of authority in such matters would threaten the state's preeminent role in regulating state pilotage by automatically stripping Soriano of his state license. "We agree with Soriano that the regulation has the effect of exp[a]nding the Commandant's authority beyond the statute into an area traditionally reserved by the states. Long ago Congress granted to the states the power to regulate pilots, except as Congress might otherwise provide." (*Ibid.*) "The Commandant's regulation, which purports to place state pilots under Coast Guard discipline, infringes upon an area specifically reserved by Congress for 185 years for regulation by the states and acknowledged by the Supreme Court for more than 120 years to be a subject of peculiarly local concern." (*Id.* at p. 684; accord, *Dietze* v. *Siler* (E.D.La. 1976) 414 F.Supp. 1105, 1112 ["In our view, the interpretation of [federal law] we adopt herein is wholly consistent with this historical attempt of Congress to preserve the integrity of state regulation even while promoting public safety."].)

In the present case, of course, we are not concerned with interpretation of any such limiting federal statute or regulation designed to prevent the Coast Guard from infringing upon state authority. Nevertheless, the *Soriano* court's recognition of the fact that pilotage is "a subject of peculiarly local concern"

which has been "specifically reserved . . . for regulation by the states" is certainly consistent with our analysis. (494 F.2d at p. 684.) The federal role in pilotage regulation is quite limited; federal law certainly does not occupy the field. (See *ibid.*) By parity of reasoning, federal law does not displace preeminent state power to revoke a state license, even if the pilot was acting at the time of a particular transgression under a federal license. Of course, the state cannot revoke a federal license; but that is not the issue here.

### 3. *The Baggett Decision*

The other federal circuit court authority, *Baggett v. Dept. of Pro. Reg., Bd. of Pilot Com'rs* (11th Cir. 1983) 717 F.2d 521, is more problematical. The actual holding in *Baggett* related only to the question of federal district court abstention from the assertion of federal subject matter jurisdiction. Two judges held, over a vigorous dissent, that the federal district court should not have abstained from ruling on a controversy arising from facts similar to this case, where a state agency sought to revoke a state license as a result of misconduct a pilot engaged in while acting under the authority of his federal license. In so ruling on the abstention issue, the majority briefly observed in dicta that "When preemption [by federal law] is readily apparent, however, and, because of preemption, the state tribunal is acting beyond the lawful limits of its authority, abstention can serve no principle of comity . . . ." (*Id.* at p. 524.)

Judge Hatchett dissented, observing that abstention was appropriate in such a case. On the preemption issue, he effectively rebutted the majority's vague and insufficiently considered dicta: "I find preemption to be far from apparent in this situation. Although the State of Florida can neither impose conditions upon, nor regulate, the pilotage of federally-enrolled vessels, the State does have authority to regulate the receipt and continued validity of state licenses. State action against a pilot's state license in no way affects the status of that pilot's federal license." (*Baggett v. Dept. of Pro. Reg., Bd. of Pilot Com'rs, supra,* 717 F.2d at p. 525 (dis. opn. of Hatchett, J.).)

We leave to the federal courts the proper delineation of the doctrine of abstention from the assertion of federal subject matter jurisdiction. As to the question of federal preemption which was peripherally involved in *Baggett,* we agree with Judge Hatchett, and cannot agree with the misleading dicta of the *Baggett* majority. The issue here is the continued validity of a state license, not a federal one. The state, not the federal government, issues state licenses. Given the fact that federal law in no way occupies the field of pilotage—but rather reserves to the states the preeminent role in this matter of local concern, the state can revoke a state license despite the fact that a

pilot may have, fortuitously, been operating a federally enrolled vessel at the time of a crash. (See *Steamship Company* v. *Joliffe, supra,* 69 U.S. at pp. 459, 462-463 [17 L.Ed. at pp. 807-808, 808-809]; *Soriano* v. *United States, supra,* 494 F.2d at p. 684.)[3]

### 4. *State Power Over State Pilots*

■ Where federal legislation does not occupy the field and in fact expressly contemplates a state regulatory role, as here, the state retains the power under its own laws to regulate the hazardous activity in question. (See *Steamship Company* v. *Joliffe, supra,* 69 U.S. at pp. 462-463 [17 L.Ed. at pp. 808-809]; *Soriano* v. *United States, supra,* 494 F.2d at p. 684; cf. *Baggett* v. *Dept. of Pro. Reg., Bd. of Pilot Com'rs, supra,* 717 F.2d at p. 525 (dis. opn. of Hatchett, J.); cf. also *Silkwood* v. *Kerr-McGee Corp.* (1984) 464 U.S. 238, 256-257 [78 L.Ed.2d 443, 457-458, 104 S.Ct. 615] [Federal nuclear safety regulations did not preempt a state claim for punitive damages.].)

■ Significantly, United States Supreme Court authority not cited by the parties rejects the contention of appellant that a state cannot regulate federally enrolled vessels under state pilotage laws. (*Huron Cement Co.* v. *Detroit* (1960) 362 U.S. 440, 447 [4 L.Ed.2d 852, 858-859, 80 S.Ct. 813, 78 A.L.R.2d 1294].) "The mere possession of a federal license, however, does not immunize a ship from the operation of the normal incidents of local police power, not constituting a direct regulation of commerce. *Thus, a federally licensed vessel is not, as such, exempt from local pilotage laws . . . .*" (*Ibid.,* citing *Cooley* v. *Board of Wardens of Port of Philadelphia, supra,* 53 U.S. at pp. 320-321 [13 L.Ed. at pp. 1005-1006], italics added.)

We do not doubt that the First Congress in 1789, or succeeding ones, could have occupied the field of pilotage completely with preeminent federal law; the point is that Congress has not done so and, for good reasons, has left to the states the regulation of state pilot licenses, a subject of local knowledge and concern. (See *Steamship Company* v. *Joliffe, supra,* 69 U.S. at pp. 462-463 [17 L.Ed. at pp. 808-809.)

Appellant's rhetorical attempts to make the state's action appear to be an assault on federal prerogatives or his federal license are unpersuasive. For instance, he claims that suspension of his state license will, in fact, make it hard for him to find and perform work as a pilot of federally enrolled

---

[3]As appellant correctly noted at oral argument, the *Baggett* decision is "not a comprehensive opinion." The *Baggett* majority did not examine in detail the statutory scheme and relevant precedents; in fact, it did not cite precedents dealing with proper state regulation of pilotage, but reached its result without analysis of relevant case law.

vessels, for which he will retain his federal license. This argument obviously proves too much: It would forbid *any* state suspension of appellant's state license, even where he was incontestably operating under his state license at the time of an accident, since suspension of the state license might make it more difficult for appellant to continue piloting under his federal license. Moreover, the fact that private parties might not wish to entrust appellant with a loaded oil tanker, after his state license had been suspended for the crash in issue here, does not invoke any principles of federal law. Private parties are not regulated by federal law in this matter, and the collateral consequences of the suspension of appellant's state license is, in any event, not a matter of preeminent federal concern.[4] "We cannot hold that the local regulation so burdens the federal license as to be . . . invalid." (*Huron Cement Co.* v. *Detroit, supra,* 362 U.S. at p. 448 [4 L.Ed.2d at p. 859].)

In addition, we find no merit in appellant's contention that state action, suspending his state license as a result of the circumstances of this crash, somehow impairs or is inconsistent with potential Coast Guard regulation of appellant's federal license as a result of the same crash. Appellant holds two separate licenses from two different sovereigns, and must reasonably expect to satisfy their concerns as to his competence in separate proceedings.

Further, in the present case the Coast Guard explicitly disclaimed any objection to the state license proceedings instituted before the Board, noting that the Board's proceedings would "not interfere with the Coast Guard's investigation or any possible subsequent suspension and revocation proceedings involving his Federal pilot license." Of course, under *Soriano*, the federal authorities could not block or institute proceedings against appellant's state license in any event.

We can likewise reject appellant's contention that state proceedings leave him potentially subject to inconsistent rulings. There is no danger that the state proceedings suspending the state license will be overturned by any federal proceedings involving the federal license, and the fact that his federal

---

[4]Specifically, we reject appellant's suggestion that his state license cannot be revoked because the local pilots association might thereafter decline to allow him to use its boats in order to reach ships upon which appellant could use his federal license. Such hypothetical action by private parties would not be the action of the state, which has confided in the Board the jurisdiction to revoke state licenses. (Harb. & Nav. Code, §§ 1125, 1150; Cal. Code Regs., tit. 7, § 219.) The state does not thereby impair or impede appellant's federal license. (Cf. *Ray* v. *Atlantic Richfield Co.* (1978) 435 U.S. 151, 158-159 [55 L.Ed.2d 179, 188-190, 98 S.Ct. 988] [States could not require a state license on federally enrolled vessels.]; *Chevron U.S.A., Inc.* v. *Hammond* (9th Cir. 1984) 726 F.2d 483, 501 [States retain concurrent jurisdiction over regulation of pollution from oil tankers.]; *Beveridge* v. *Lewis* (9th Cir. 1991) 939 F.2d 859, 863-864 [Localities retain concurrent jurisdiction over mooring and anchoring of vessels, despite nonexclusive federal regulation.].)

license might or might not be suspended as a result of the same conduct is irrelevant. The potential inconsistency issue appellant raises, arguendo, pervades the system of pilotage regulation; it is not dependent upon the facts of this case, but may arise as a necessary consequence of the dual governmental regulatory system. That argument cannot, consequently, be utilized to emasculate pilotage regulation by the states, which Congress has specifically endorsed. Accordingly, the Board's authority to suspend appellant's state pilot license under state law is not preempted by federal law.

To summarize, the state retains complete power to suspend or revoke a state license, as part of its historically preeminent role over pilotage. (See *Steamship Company* v. *Joliffe, supra*, 69 U.S. at pp. 462-463 [17 L.Ed. at pp. 808-809].) In recognition of this preeminent state role, the federal government cannot revoke a pilot's federal license for actions he took under his state license. (*Soriano* v. *United States, supra*, 494 F.2d at p. 684.) Nor can a state revoke a federal license, for any reason. However, the state may suspend a state license in the exercise of its plenary power over pilotage, as a result of any relevant misconduct—including misconduct while acting under a federal license.

B. *The Other Issues Raised by Appellant Lack Merit**

. . . . . . . . . . . . . . . . . . . . . . . . .

III. DISPOSITION

The judgment is affirmed.

Smith, Acting P. J., and Benson, J.

---

*See footnote, *ante*, page 1659.